UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
LARAMI CORPORATION,

Plaintiff, 95-MISC-00003

v.

ALAN AMRON and
TALK TO ME PRODUCTS, INC.,

Defendants.
---------------------------------------------------x

**SATISFACTION OF JUDGMENT**

TO THE CLERK:

WHEREAS, on July 22, 1994, judgment in the principal amount of $10,000,000 (the "Judgment") was entered against Alan Amron and Talk To Me Products, Inc., and in favor of Larami Corporation, in Larami Corporation v. Alan Amron, et al., United States District Court for the Eastern District of Pennsylvania (the "Court"), No. 91-6145, and subsequently registered with this Court under the above docket number by the law firm of Hangley Connolly Epstein Chicco Foxman & Ewing, which is no longer in existence;

WHEREAS, on March 23, 1995, the Court denied Alan Amron's motions to set aside the Judgment and issued an opinion that is attached hereto as Exhibit A and incorporated into these recitals by reference;

WHEREAS, on August 18, 1995, the United States District Court for the Eastern District of Pennsylvania (E.D. Pa. No. 95-4328) granted a preliminary injunction against Alan Amron and Alan Amron Development, Inc ("AADI") and issued an opinion that is attached hereto as Exhibit B and incorporated into these recitals by reference;

WHEREAS, on August 30, 1995, Alan Amron filed a petition for relief under Chapter 11 of the Bankruptcy Code (Bk. E.D.N.Y. No. 8 95 85147) in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court");

WHEREAS, on April 19, 1996, the United States Court of Appeals for the Federal Circuit affirmed the Judgment (Fed. Cir. No. 95-1317);

WHEREAS, on November 5, 1996, the Bankruptcy Court (Bk. E.D.N.Y. No. 8 95 85147 478) ruled that the Judgment was not a debt dischargeable in bankruptcy because it was for "willful and malicious injury to another entity or property of another entity" under 11 U.S.C. § 523(a)(6);

WHEREAS, on October 24, 1997, the Bankruptcy Court approved a Settlement Agreement (the "1997 Settlement Agreement") between, *inter alia*, Alan Amron, AADI, on the one hand, and Hasbro, Inc. and Larami Limited ("the Hasbro Parties"), on the other which terminated many of their then-existing disputes and provided for arbitration of future disputes;

WHEREAS, the 1997 Settlement Agreement contained a provision that, for a period of ten years, Alan Amron and any companies controlled by him or for which he serves as an officer will not commence any litigation against, *inter alia*, the Hasbro Parties;

WHEREAS, Alan Amron did not disclose the existence of Amron Development, Inc. ("ADI"), or of a patent application (the "ADI Patent Application") which he had assigned to it in 1995, at any time during the course of his personal bankruptcy proceeding, including the negotiation of the 1997 Settlement Agreement, although he had an obligation to do so;

WHEREAS, on June 15, 2000, the United States District Court for the Eastern District of Pennsylvania (E.D. Pa. No. 00-mc-120) confirmed an arbitration award that U.S. Patent No. 5,915,771, which issued from the ADI Patent Application, was not infringed by the Hasbro Parties and taxing costs against Alan Amron and ADI;

WHEREAS, on November 26, 2001, Alan Amron and ADI commenced litigation against, *inter alia*, the Hasbro Parties, in the United States District Court for the Eastern District of New York (No. 01-cv-07830);

WHEREAS, on December 6, 2001, Star Creations Investment Co., Ltd. f/k/a Larami Corporation assigned all of its right, title and interest in the Judgment to Larami Limited;

WHEREAS, on February 22, 2006, the United States District Court for the Eastern District of Pennsylvania (E.D. Pa. No. 02-mc-0231) issued an opinion, which is attached hereto as Exhibit C and incorporated into these recitals by reference, confirming an arbitration award that Alan Amron had breached the 1997 Settlement Agreement by commencing litigation against the Hasbro Parties in the United States District Court for the Eastern District of New York in 2001, and had unclean hands due to his failure to disclose the existence of ADI and the existence of the ADI Patent Application during the pendency of the bankruptcy proceedings and the settlement negotiations, rendering U.S. Patent No. 6,234,347, which also issued from the ADI Patent Application, unenforceable against the Hasbro Parties;

WHEREAS, on February 22, 2006, judgment in the principal amount of $44,343.37 was entered against Alan Amron and ADI, and in favor of the Hasbro Parties, in the United States District Court for the Eastern District of Pennsylvania (E.D. Pa. No. 02-mc-0231), in accordance with the opinion attached hereto as Exhibit C, and the court ordered Alan Amron to pay this sum by March 24, 2006;

WHEREAS, the Judgment is final, valid, unappealable, nondischargeable, enforceable and unpaid;

WHEREAS, Larami Limited desires to prevent the recurrence in the future of litigation with Alan Amron, and the general types of actions by Alan Amron that gave rise to the aforementioned judgments, as partially set forth in the court opinions attached hereto as Exhibits A through C;. and

WHEREAS, on July 17, 2006, Larami Limited and Alan Amron, among other parties, entered into a certain Forbearance Agreement which remains in full force and effect notwithstanding this Satisfaction of Judgment;

PLEASE mark the Judgment as SATISFIED as to Larami Limited, as the assignee of judgment creditor Larami Corporation.

LAW OFFICES OF GARY A.ROSEN, PC

BY: s/Gary Rosen
Gary A. Rosen (GAR-4397)
PA. ID No. 40967
1831 Chestnut Street, Suite 802
Philadelphia, PA 19103
(215) 972-0600

Attorney for Larami Limited
(assignee of Larami Corporation)

**EXHIBIT A**



Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
(Cite as: Not Reported in F.Supp.)

Page 1

H
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
LARAMI CORP., Plaintiff,
v.
**Alan AMRON** and Talk To Me Products, Inc., Defendants.
**No. CIV. A. 91-6145.**

March 23, 1995.

MEMORANDUM

REED
*1 Currently before me are the motions of defendants Alan Amron and Talk To Me Products, Inc. ("TTMP") for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 and for a new trial pursuant to Fed.R.Civ.P. 59 (Document Nos. 78, 79). This Court has jurisdiction over plaintiff's claims under the Lanham Act and Pennsylvania common law pursuant to 28 U.S.C. § § 1331, 1338(a), 1367, 15 U.S.C. § 1121. For the reasons stated below, the motions of defendants shall be denied.

I. BACKGROUND

This is a case involving a dispute over toy water guns. On June 25, 1992, plaintiff Larami filed an amended complaint alleging violations of Larami's rights as protected by section 43(a) of the Lanham Act (Count III), and the Pennsylvania common laws of defamation (Count IV), unfair competition (Count V), and interference with existing and prospective business relations (Count VI).FN1 Plaintiff Larami develops, manufactures, distributes and sells a wide variety of children's toys, including pressurized air water guns. One such line of pressurized air water guns is the "Super Soaker" water guns. Since the early 1990's, Larami's "Super Soaker" product line has been an overwhelming commercial success. The present controversy involves plaintiff's allegations that defendants embarked upon a course of conduct to obtain some interest in Larami's "Super Soaker" product line through improper means.

After a six day jury trial which commenced with the selection of a jury on June 20, 1994, the jury found that both defendants here, Alan Amron and Talk To Me Products, Inc., had acted improperly and violated Larami's legal rights as alleged in all four counts of the amended complaint as stated above. On June 27, 1994, the jury awarded Larami damages in the amount of ten million dollars ($10,000,000.00). On August 5, 1994, defendants filed the present motions for judgment as a matter of law and for a new trial.FN2

II. DISCUSSION

A. Rule 50(b) Motion for Judgment As A Matter of Law

1. Procedural requirements of Rule 50(b)

The defendants here have moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b).FN3 Rule 50(b) provides in relevant part that,
Whenever a motion for a judgment as a matter of law made *at the close of all the evidence* is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be *renewed* by service and filing not later than 10 days after entry of judgment.

Fed.R.Civ.P. 50(b) (emphasis added). Therefore, under Rule 50(b), a court cannot enter a judgment as a matter of law unless the party seeking the judgment made a Rule 50(a) motion at the close of *all of the evidence*. *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1261-63 (3d Cir.1991); *Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 744 (3d Cir.1990) (citing *Gebhardt v. Wilson Freight Forwarding Co.*, 348 F.2d 129 (3d Cir.1965)); *De Marines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1195 n. 4 (3d Cir.1978) (condition "preserves for the trial court, as a question of law, the sufficiency of the evidence and allows the court an opportunity, on a motion for judgment n.o.v., to pass on that strictly legal question"); *Markovich v. Bell Helicopter Textron, Inc.*, 805 F.Supp. 1231, 1234 (E.D. Pa.), *aff'd without op.*, 977 F.2d 568 (3d Cir.1992); *Agresta v. City of Philadelphia*, 801 F.Supp. 1464, 1469 (E.D.Pa.1992), *aff'd without op.*, *Agresta v. Sambar*, 993 F.2d 223 (3d Cir.1993); *see also Nestier Corp. v. Menasha Corporation-Lewisystems Division*, 739 F.2d 1576,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1580 n. 6 (Fed. Cir.1984), *cert. denied,* 470 U.S. 1053 (1985). The requirement that a motion for directed verdict be made at the end of all of the evidence "affords the non-moving party an opportunity to reopen its case and present additional evidence. Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of [its] seventh amendment rights."[FN4] *Markovich,* 805 F.Supp. at 1234; *see Windsor Shirt Co. v. New Jersey Nat'l Bank,* 793 F.Supp. 589, 594 (E.D.Pa.1992), *aff'd without op.,* 989 F.2d 490 (3d Cir.1993). The Court of Appeals for the Third Circuit has held that "the introduction of evidence after the denial of a motion for directed verdict constitutes a *waiver* of the error, if any, in the denial unless the motion is renewed at the close of all the evidence." *Gebhardt,* 348 F.2d at 132 (emphasis added) (where defendant made motion for directed verdict at close of plaintiff's evidence but not after defendant offered evidence, defendant's motion was improper); *Nowland v. Shoe Corp. of America,* 47 F.R.D. 6, 7 (D. Del.1969) (same).

***2** The plaintiff argues that the motions of the defendants for judgment as a matter of law are improper because the defendants failed to present a motion for a directed verdict at the close of *all* the evidence. Defendants do not dispute that they failed to make such a motion.[FN5] Rather, defendants offer a myriad of reasons why they should be excused from complying with the requirement of the Rule.

Defendants argue that no waiver occurs when a defendant makes a motion for directed verdict after the plaintiff rests but fails to renew that motion at the end of the evidence if the defendant's case is not of equal or greater length and substance than the plaintiff's case. Defendants contend that because defendants only presented the testimony of one witness which was "brief enough so as not to change the questions of sufficiency of evidence," defendants should be relieved of their obligation to move for a directed verdict at the close of all the evidence. Defendants offer no support for this proposition and this Court does not find defendants' argument to be persuasive.[FN6]

In the instant case, the evidence proffered by defendants was substantive and the testimony of Amron certainly could not be described as "inconsequential." Defendant Amron testified for over two hours on direct examination regarding issues bearing on essential elements of the claims and defenses. Indeed, the memorandum of defendant Amron here in support of defendants' arguments relating to the sufficiency of the evidence relies almost exclusively on citations to Mr. Amron's direct defense testimony. Moreover, through Mr. Amron, defendants offered various items into evidence. Defendant Amron's testimony was substantial and could have had a significant impact on the jury's findings. Regardless, in this Circuit, the presentation of evidence by a defendant waives the objections raised in the original directed verdict motion and because defendants have not cited to one Third Circuit case, nor can this Court find one, that stands for the proposition that the extent of the evidence presented by a movant can obviate its duty to move for a directed verdict after the close of all of the evidence, defendants' argument is unavailing.

Although courts generally have been strict in requiring that a motion for directed verdict be made at the close of all the evidence, this Court has discovered a line of cases in some of the other circuits that have relaxed this requirement. Those cases have determined that a motion for directed verdict need not be renewed at the close of all the evidence where the lower court indicated that renewal of the motion was unnecessary and/or the evidence following the party's unrenewed motion under Rule 50(a) was either nonexistent or was brief enough to be obviously inconsequential and superfluous on the issue of the evidence's legal sufficiency. However, the existence of such a case is "unusual." *See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 810 n. 7 (1st Cir.), *cert. denied,* 488 U.S. 955 (1988); *Smith v. University of North Carolina,* 632 F.2d 316, 339 (4th Cir.1980); *Beaumont v. Morgan,* 427 F.2d 667, 670 (1st Cir.), *cert. denied, Beaumont v. Aussenheimer,* 400 U.S. 882 (1970); 5A Moore's Federal Practice ¶ 50.08 at 50-92 (1994); *see also Halsell v. Kimberly-Clark Corp.,* 683 F.2d 285, 294 (8th Cir.1982), *cert. denied,* 459 U.S. 1205 (1983).

***3** I find that even if the Third Circuit were to apply the more relaxed standard above, the facts here would not warrant excusing defendants from the prerequisite of Rule 50(b). First, as noted above, defendant Amron's testimony was not insubstantial and clearly defendants believed that it made a difference as to the sufficiency of the evidence as demonstrated by their extensive citation to Amron's testimony in their motion relating to this very issue. Second, rather than indicate to the defendants that renewal of their Rule 50(a) motion was not necessary, this Court specifically suggested to defendants that they had to renew their motion. After their original directed verdict motion was denied at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 3

the close of the plaintiff's case, this Court advised defendants that a charge conference would be necessary at the close of all of the evidence *unless a motion for directed verdict was granted at that time. See* June 23, 1994 transcript ("6/23/94 Tr.") at 98. Accordingly, because the evidence presented by defendants was substantial, and because this Court did not suggest that defendants were relieved of their requirement to renew their motions, defendants have no basis for relief.

Defendants also argue that they are not barred from bringing the present motion under Rule 50(b) because the policy behind the Rule has been satisfied here. Defendants note that a directed verdict motion is required to be made at the close of all of the evidence to ensure that the nonmoving party can cure technical defects in proof before the case goes to the jury. Defendants assert that because that policy has been met here, their failure to act at the close of the evidence should not be dispositive of their present motions. According to defendants, Larami cannot claim any prejudice due to defendants' failure to move for a directed verdict at the close of the evidence because Larami knew of (1) defendant Amron's defenses from his "statement" to the jury, and (2) every possible infirmity in the proof of plaintiff's case from the defendants' directed verdict motion made at the close of the plaintiff's case.

I find defendants' argument to be unpersuasive. First, plaintiff was not required to rely upon defendants' descriptions of the evidence in their statements to the jury. Plaintiff had the right to cure any problems in the record after hearing defendants' arguments and after *its* own observation of the defendants' case. Second, even if defendants were correct that plaintiff had an opportunity to cure any infirmities in its case, defendants ignore the fact that Rule 50(b) has its underpinnings in the Seventh Amendment.[FN7] Accordingly, although the requirement of Rule 50(b) may serve as a technicality, it cannot merely be dispensed with. *Mallick,* 644 F.2d at 234 (where defendants made motion for directed verdict at end of plaintiff's case, but failed to do so at close of evidence, motion was improperly considered). Defendants' argument, if accepted, would only satisfy the "tactical" and procedural concern for the prerequisite in Rule 50(b), and not the constitutional one. *See id.; Lowenstein v. Pepsi-Cola Bottling Co.,* 536 F.2d 9, 10-12 & n. 7 (3d Cir.), *cert. denied,* 429 U.S. 966 (1976) (where defendant's motion for directed verdict at the end of plaintiff's case was formal, detailed and hotly contested, but plaintiff failed to move for directed verdict at close of all the evidence, motion for judgment n.o.v. was improper). Accordingly, because the defendants have not performed any act that even arguably could be construed as a motion for directed verdict to satisfy the prerequisite of Rule 50(b) and the Seventh Amendment, and because defendants have not demonstrated a sufficient basis to justify their failure to make such a motion at the close of all the evidence, if any exists at all, the motions of defendants for judgment as a matter of law pursuant to Rule 50(b) shall be denied.

2. The merits of the motions

*4 Even if defendants had complied with the requirements of Rule 50(b), their motions would still fail. "A post-verdict motion for judgment as a matter of law pursuant to Rule 50(b) should be granted only when there is no legally sufficient basis for a reasonable jury to have found for the non-moving party." *Garrison,* 820 F.Supp. at 818. The reviewing court must view the evidence in the light most favorable to the non-moving party and the non-moving party must be given the benefit of all logical inferences that could be drawn from the evidence presented and have all conflicts in the evidence resolved in its favor. *Id.; Windsor Shirt Co.,* 793 F.Supp. at 594. "If 'the record contains the minimum quantum of evidence from which a jury might reasonably afford relief,' then the reviewing court must deny the motion." *Garrison,* 820 F.Supp. at 818; *Keith,* 909 F.2d at 745. It is for this reason that when there is sufficient evidence in conflict, or insufficient evidence to conclusively establish the movants' case, judgment as a matter of law should not be granted. *Garrison,* 820 F.Supp. at 818; *Windsor Shirt Co.,* 793 F.Supp. at 595. "The reviewing court should not grant a judgment as a matter of law merely because its view of the evidence differs with that manifest in the jury's verdict. Such action on the part of the reviewing court would constitute a usurpation of the jury's province as factfinder." *Garrison,* 820 F.Supp. at 819; *Windsor Shirt Co.,* 793 F.Supp. at 595 (evaluation of witness credibility is the exclusive function of the jury).

Defendants argue that there is no legal basis to support the jury's liability verdict as to plaintiff's claims for intentional interference with existing and prospective contractual relations, defamation, commercial disparagement, and the Lanham Act and, therefore, this Court should enter judgment as a matter of law on these counts of the amended complaint. However, after applying the principles

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 4

stated above and after finding that there is sufficient evidence in the record to support the jury's verdict, defendants' motions shall be denied.

(a) State of mind

As to plaintiff's claims for intentional interference with contractual relations, commercial disparagement and defamation, the defendants argue that a reasonable jury could not have found in favor of plaintiff because there was insufficient evidence to find that defendants acted with an intent to harm Larami or that defendants did not have a good faith belief in the merits of their intellectual property claims.[FN8] In support of their assertion, defendants cite to a litany of excerpts from defendant Amron's testimony to demonstrate that Amron's conduct was motivated only by a desire to protect his or TTMP's intellectual property rights. *See* defendant Alan Amron's motion for judgment as a matter of law and/or a new trial ("defendant Amron's motion") at 6-8, 9-11.

The evidence reveals that defendants sent a series of communications to Larami's customers, potential customers and other business associates which threatened various legal actions for patent and trademark infringement against anyone buying or selling Larami's "Super Soaker" products, or using that trademark. This Court has previously found as a matter of law that defendants' charges of patent and trademark infringement, if made, were not true. Larami contends that a fair inference could have been drawn by the jury that the communications of defendants constituted a tortious attempt to pressure Larami into giving defendants a royalty interest or a license in the success of the "Super Soaker" product line before Larami could disprove the infringement allegation through legal proceedings. Larami argued to the jury that defendants created an intolerable nuisance in the marketplace during the lifespan of the toy in an effort to convince Larami that it was cheaper for Larami to settle with defendants rather than to engage in litigation. *See* plaintiff's memorandum in opposition to defendant Alan Amron's motion for judgment as a matter of law and/or a new trial ("plaintiff's opp.") at 5-6; *see e.g.,* June 24, 1994 transcript at 28-29.

*5 At the outset, state of mind is generally a jury question and juries are free to make any inferences supported by the evidence. *Lichtenstein v. Kidder, Peabody & Co.,* 777 F.Supp. 423, 427 (W.D. Pa.1991); *Grimes v. Prudential Ins. Co.,* 585 A.2d 29, 31 (Pa.Super.1991) (whether a misstatement of fact was made in bad faith is an issue of fact for the jury); *Agriss v. Roadway Exp., Inc.,* 483 A.2d 456, 463 (Pa.Super.1984) (it is a question of fact for the jury whether a privilege has been abused). In the instant case, there is abundant evidence in the record from which the jury could infer that the defendants (1) did not have a good faith reasonable belief that defendants had a legally protected interest; and (2) intended to cause unnecessary pecuniary loss to Larami. Plaintiff has presented sufficient evidence to permit a jury to find that the defendants were engaged in a plan to harass and intimidate Larami, its customers and potential customers to force Larami to pay royalties to the defendants to which they were not entitled. Because the record is replete with evidence supporting plaintiff's claims, only a few examples will be addressed.

Evidence offered by plaintiff would enable a reasonable trier of fact to infer that defendants did not have a good faith belief that their patent or trademark rights were being infringed. At trial, the jury was informed that defendants had claimed superior rights to the trademark "Soaker" on the basis of *one* single token sale of a battery-operated water gun under the name "The Totally Rad Soaker." This claim was defeated on a motion for summary judgment, filed in the United States District Court in the Southern District of New York, in which the court noted that "The lack of prior use dooms [Talk To Me Products'] suit," and "For [T]alk To Me Products] to pursue its claims at trial would therefore be an exercise in futility." Exh. P-118. The jury was permitted to consider the Court's denial of TTMP's trademark infringement claim.[FN9] In addition, the jury could accept or reject the testimony of defendant Amron regarding his belief in the worth of the claim.

The manner in which defendant Amron asserted TTMP's trademark rights also could support the inference that the conduct of defendants was not undertaken in a good faith attempt to enforce trademark rights. For example, according to testimony adduced at trial, no later than September of 1990, Mr. Amron knew that Larami had chosen the name "Super Soaker" for its air pressure gun and Mr. Amron did not object to its use. Mr. Amron and Larami continued to do business for many months thereafter. However, in June of 1991, after Mr. Amron became dissatisfied with Larami regarding an unrelated agreement between the two, Mr. Amron informed Larami that the use of the name "Super Soaker" was infringing one of his trademarks, "The Totally Rad Soaker," and that Larami should pay him

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 5

a one percent royalty or else Mr. Amron would "litigate." *See* June 21, 1994 transcript ("6/21/94 Tr.") at 42-50. This evidence supports the inference that Mr. Amron may never have believed in the worth of his claim, rather, he may have asserted his trademark rights in retaliation for his dissatisfaction with Larami's performance relating to the other agreement.

***6** Moreover, there was also evidence that in early 1990, after Larami had released its air pressure gun for sale under the name "Power Drencher," Mr. Amron called Al Davis of Larami contending that Larami had to change the name of the gun because it was infringing Mr. Amron's trademark rights in the name "Drencher." Mr. Amron then informed the plaintiff that Larami did not have to change the name of its product if the plaintiff paid him a royalty. Because by that point Larami had not advertised the product on television and sales were still small, Larami decided to change the name to "Super Soaker." Mr. Amron had thus lost his opportunity to obtain a royalty.

This evidence supports the inference suggested by plaintiff that Mr. Amron learned his lesson from the "Power Drencher" incident and that later in June of 1991, when the dispute over the "Super Soaker" arose, Mr. Amron *waited* to inform Larami of his alleged rights in the name "Soaker" so Larami could not change the name of the product. This time, Larami would have to pay Amron a royalty. Indeed, according to the evidence, after eight months had passed since Amron learned of the use of the "Super Soaker" name, and after the product had become well-known, Mr. Amron first came to Larami claiming infringement and seeking royalties. *See* 6/21/94 Tr. at 8-20, 42-43. Larami argues, and the inference is certainly permissible, that Mr. Amron belatedly asserted his trademark rights in an effort to secure a royalty from the sales of the "Super Soaker" and not because of any alleged motivation to protect trademarks rights.

There is also sufficient evidence in the record to permit a jury to conclude that defendants did not have a good faith belief that TTMP's patent rights were being infringed. First, after observing the differences between the two patented guns, jurors could simply judge for themselves whether one could reasonably and in good faith believe that the Super Soaker infringed defendants' patent ("Esposito patent"). The Esposito patented gun was designed to light up its discharged stream of water to look like a laser beam. It did not have a detachable water tank outside the gun as the Super Soaker did and did not look anything like the Super Soaker. A simple comparison of the two patents could have enabled this jury to conclude that defendants did not have a reasonable, good faith belief that their patent was being infringed.[FN10] *See* exh. P-1, P-12.

The manner in which Mr. Amron acquired the rights to the Esposito patent also permits the inference that defendants did not have a good faith belief in the merits of their claims. After learning one night from Gerard Dunne, his "partner" and trial counsel, in September of 1991 that the Esposito patent had "some incredibly broad claims," Mr. Amron immediately tried to reach Mr. Esposito by telephone. *See* 6/23/94 Tr. at 22. Mr. Esposito's line was busy, so Mr. Amron called the police station in Portage, Indiana and the police came over to Mr. Esposito's home to inform him to call the police station where Mr. Amron's number had been left. *See* 6/21/94 Tr. at 15. When Mr. Esposito, thinking the call was a prank because he had owned the patent for eleven years and no company had ever been "really interested" in it, refused to come to New York, Mr. Amron departed on a plane the very next morning to meet Mr. Esposito. By the end of the next day on September 26, 1991, Mr. Esposito gave TTMP his rights under the patent and TTMP gave him a $5,000 advance on the royalties and 50 percent of all licensing fees. *See* 6/21/94 Tr. at 26-27.

***7** According to the evidence, two days after Mr. Amron acquired the license to the Esposito patent, TTMP sent out a notice that informed toy buyers and manufacturers that TTMP understood that Larami toys had been offering for sale in the United States an air pressurized water gun that defendants believed was in violation of TTMP's intellectual patent rights (the Esposito patent). According to the notice, TTMP would be "seeking permanent injunctions preventing all shipments of these goods into the United States." Moreover, TTMP informed the toy industry that "Legal action has not yet been taken so [TTMP] would not cause any damages to either Larami or their customers at the present time. However, [TTMP is] putting both Larami and their customers, on notice." Exh. P-48. The notice was disseminated during the annual toy fair in Hong Kong where every major toy retailer "of any substance" came to set up its spring purchases. *See* 6/21/94 Tr. at 66. Mr. Amron's haste to obtain Mr. Esposito's property rights and the timing and targeting of the public announcement could support the inference that defendants were seeking a tool to assist them in their quest for royalties, rather than furthering an honest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 6

belief in their intellectual property rights.[FN11]

The reaction to the notice was widespread. Approximately seventy major customers of Larami came to its office carrying the notice or explaining that they had heard about the notice. At the same time that the notice was being disseminated to the toy industry, TTMP sent Larami a letter stating that,

Talk to Me Products, Inc. is willing to enter into a licensing agreement with Larami regarding the Esposito patent.... Failure to respond with a good faith offer to enter into negotiations will result in a litigation for patent infringement being taken against Larami and its customers.

Exh. P-140. *See* exh. D-55.

The evidence suggests that defendants' conduct here in threatening a lawsuit against Larami and then requesting a royalty as a settlement was not an isolated incident. Evidence elicited at trial indicates that Mr. Amron had a history of asserting intellectual property claims against Larami, potentially in an effort to obtain quick settlements. *See* 6/21/94 Tr. at 39, 6/23/94 Tr. at 37-39, 189-90. It is certainly permissible from the sequence of events and from the similarity between the defendants' modus operandi here and in other circumstances in the past, that a jury could conclude that defendants were not engaged in a reasonable good faith attempt to protect property rights, rather, they were attempting to force Larami into negotiations for a share of the profits of the Super Soaker sales.[FN12]

The record is also replete with other instances, when taken in the light most favorable to Larami, that demonstrate that defendants intended to injure Larami by interfering with its relationships with its customers. Indeed, merely from an examination of the text of the notices disseminated by defendants, a reasonable juror could find that the defendants intended to harm Larami's relationships with present and future clients. *See* exhs. P-42, P-48, P-52, P-61, P-67, P-74, P-76, P-113, P-115. For other examples, consider the following:

***8** 1) TTMP sent a letter to Larami's customer, the "Sharper Image," informing it that if TTMP prevailed in its litigation against Larami, TTMP would still seek damages from "Larami customers like the Sharper Image Catalog Company." TTMP did not explain how it could seek damages against the Sharper Image if it recovered its damages in its litigation against Larami. *See* exh. P-63;

2) TTMP brought an action against Larami's customer, Kay-Bee Toy & Hobby Shops involving the same patents, accused device, and infringement issues as the present suit. *See* P-75, P-82. The jury could conclude that the only reason TTMP brought the action against Kay-Bee Toy & Hobby Shops was to further their plan to harass Larami's customers;

3) Defendants disseminated a letter to toy buyers and manufacturers stating that anyone buying or selling Larami Super Soaker products would be "prosecuted to the fullest extent of the law." A reasonable juror could find that this statement was intended to created the impression that customers of Larami would expose themselves to criminal charges by purchasing a Super Soaker water gun. *See* P-42;

4) A reasonable jury could find that the notices of defendants that contained their accusations and threats were disseminated far more widely and indiscriminately than was reasonably justified by any legitimate interest on defendants' part. *See* exh. P-39; 6/23/94 Tr. at 161-62; and

5) Defendant Amron *repeatedly* informed Al Davis in various circumstances that it would be cheaper to pay him a royalty rather than to litigate. *See* 6/21/94 Tr. at 48-49, 69.

After an examination of the conduct of defendants, I conclude that a reasonable jury could find that defendants' sole basis for their actions was to dissuade customers of Larami from doing business with Larami regarding the Super Soaker product line in an effort to strong-arm Larami into giving them a share of the profits. As a result, a jury could reasonably find that the defendants did not have a good faith belief in the merits of their claims of patent or trademark infringement. Because the evidence cited by defendants relating to defendant Amron's intentions is, *at best,* in conflict with the evidence discussed above, and because all conflicts must be resolved in the nonmoving party's favor, defendants' arguments relating to their lack of intent to harm Larami are unavailing.[FN13]

(b) Other elements of claims that defendants argue were not proven by sufficient evidence

1. Defamation

Defendants argue that there was insufficient evidence to show that the statements of defendant Amron were defamatory or that any reader understood the defamatory meaning of the statements. Under Pennsylvania law, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 7

deter third persons from associating or dealing with him." U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923 (3d Cir.), *cert. denied,* 498 U.S. 816 (1990). I find that the record is replete with evidence to demonstrate that the notices and letters disseminated by defendants were capable of a defamatory meaning and that the readers of the communications understood the defamatory meaning of these statements.

***9** To determine the meaning of an allegedly defamatory statement, the statement must be examined in context. " 'The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' " *Id.* (citation omitted). At the outset, many of defendants' notices and letters implied or expressly stated that Larami's manufacture and sale of the Super Soaker product line were "illegal." *See e.g.,* exhs. P-113, P-115, P-73, P-78, P-42, P-48. From the face of these letters, it is obvious that they were intended to, and would tend to deter others from doing business with Larami. The threat of litigation in the form of trademark or patent infringement actions by TTMP certainly would scare Larami's customers from associating with the company. Moreover, these letters and notices would give the average reader the impression that Larami was breaking the law. As a result, the communications certainly tended to harm the toy company's reputation in the estimation of the community. Without further clarification, if customers were left with the impression that Larami was not law abiding, they likely would hesitate to do any business with Larami in the future. FN14

In addition, a reasonable fact finder could also determine that the readers of the defendants' statements understood their defamatory meaning. Plaintiff has offered voluminous evidence that the recipients of the defendants' communications understood their charges of illegality and were, as a result, more reluctant to deal with Larami. Mr. Davis testified at great length about the concerns his customers expressed in light of defendants' communications, and the efforts expended by Larami to ease their fears. *See* 6/21/94 Tr. at 50-83, exhs. P-62, P-83, P-101, P-106. For example, in a letter written by an in-house attorney for Kmart Corporation to Larami after receiving a copy of P-42, he stated that "The letter clearly threatens Kmart with prosecution 'to the fullest extent of the law' if it is buying or selling your SUPER SOAKER guns .... please confirm that Larami Corporation shall reimburse, indemnify, hold harmless and defend at its expense Kmart Corporation...." Exh. P-101. There is no doubt that a jury could permissibly infer that the recipients of the defendants' letters and notices understood defendants' claims of infringement and they were concerned that Larami might be putting its customers in jeopardy. The defendants' letters and notices clearly affected the reputation and credibility of Larami. Moreover, giving Larami the benefit of all logical inferences that could be drawn from the evidence presented, I conclude that it was reasonable for the jury to find that the readers of the defendants' letters and notices understood their defamatory meaning.

2. Commercial disparagement

Defendants next assert that judgment as a matter of law must be granted in their favor relating to plaintiff's claim for commercial disparagement in Count V of the amended complaint. Defendants argue that there was insufficient evidence to establish that the defendants knew that their statements were false or acted in reckless disregard of the truth or falsity of their statements as required to establish a claim for commercial disparagement in Pennsylvania. In further support of their contention, defendants cite to various excerpts from defendant Amron's testimony to demonstrate that he believed his statements to be true.

***10** As discussed *supra* in part II.A.2(a), there is sufficient evidence in the record to enable a reasonable jury to find that the defendants intended to cause harm to Larami and that defendants did not have a good faith belief in the merits of their claims. As a result, from the same evidence, a jury could conclude that the defendants knew that their statements to the trade regarding infringement were false. For example, as discussed earlier, the jury could have concluded from a simple comparison of the Esposito patent and the patent for the Super Soaker that defendants knew that their claims of infringement were false or that defendants acted in reckless disregard to their falsity. Moreover, the jury also could have inferred from defendant Amron's pattern of conduct in similar situations that he never believed that his statements regarding infringement were true in this instance. Finally, Mr. Amron's reliance on the opinion of counsel who had a financial interest in the advice regarding infringement could support the conclusion that defendant Amron acted in reckless disregard of the truth or veracity of the statements made. Given the conflicting evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 8

that was before the jury, it would be improper to grant judgment as a matter of law for defendants relating to plaintiff's claim of commercial disparagement.

3. Lanham Act

Defendants contend that plaintiff's claim under section 43(a) of the Lanham Act must fail because there was no evidence to demonstrate that customers or potential customers of Larami were misled or deceived as required to recover damages under the Act. Defendants assert that the evidence adduced at trial only established that Larami's customers desired indemnity agreements after receipt of defendants' letters, regardless of the truth of defendant Amron's claims regarding his intellectual property rights. Defendants state that "[t]here was no evidence that anyone cared about the merits of Amron's letter [s] just that they wanted to be indemnified." Defendant Amron's motion at 12. Defendants' argument is unavailing.

The evidence offered at trial, as discussed *supra* in part II.A.2(b)1, disclosed that Larami's customers demanded indemnifications in response to their receipt of defendants' letters and notices. In fact, at least four of the top five customers of Larami demanded indemnification agreements. The fact that these indemnifications were demanded indicates that Larami's customers were deeply disturbed by the claims of defendants in those letters. From the content of the letters seeking indemnification, it certainly would be reasonable for a juror to infer that some customers believed that defendants' claims regarding Larami's infringement had some merit. *See* 6/21/94 Tr. at 50-83; exhs. P-62, P-101, P-102, P-104, P-106, P-107, P-108. Accepting defendants' approach and therefore finding that the jury could only conclude that Larami's customers were concerned about the cost of litigation and not the merits of defendants' claim, would be inconsistent with this Court's duty to take the evidence in the light most favorable to Larami and to give it the benefit of all inferences. To survive a Rule 50(b) motion, the record must contain the minimum quantum of evidence to reasonably provide relief, not to overcome defendants' evidence. Simply, I find that there is sufficient evidence in the record relating to the conduct of Larami's customers to enable a reasonable jury to find that recipients of defendants' notices and letters were deceived into believing that Larami had infringed the patent and trademark rights of TTMP.

(c) Damages

***11** Defendants next argue that there was insufficient evidence to establish that the damages sustained by plaintiff were proximately caused by defendants' conduct. Defendants also contend that the evidence was speculative as to the amount of damages sustained. Plaintiffs counter that there was sufficient evidence of causation to warrant the award of damages and that the proof of damages was not speculative. The evidence supports plaintiff's position.

Taking the evidence in the light most favorable to plaintiff, I find that the conduct of defendants caused plaintiff to expend resources to protect its customers, and to forgo opportunities relating to licensing of the Super Soaker product. First, the evidence demonstrated that defendants' improper conduct forced Larami to indemnify and provide legal assistance to its customers and licensees to protect them from the threats of defendants.[FN15] Mr. Geoffrey H. Osborne testified that Larami expended $51,812 on legal fees relating to the defendants' conduct and that those fees were reasonable. [FN16] Based upon the logical progressive analysis of Mr. Osborne, I find that if accepted by the jury, Mr. Osborne's testimony would support the conclusion that the legal fees were reasonable and were caused by defendants' conduct. *See* 6/22/94 Tr. at 95-97.

In addition, this Court finds that there is sufficient evidence in the record to support the jury's conclusion that the improper conduct of defendants *caused* Larami to lose substantial revenue from licensing of the Super Soaker product. The following evidence is viewed in the light most favorable to plaintiff. During the Christmas season in 1991, the Super Soaker water gun was the leading selling toy in the United States. *See* 6/21/94 Tr. at 22. On February 6, 1992, Larami and Leisure Concepts, Inc. ("LCI"), one of the top licensing firms in the United States, entered into a contract[FN17] for the licensing of the concept known as "Super-Soaker."[FN18] Exh. P-69. Within a short time, Larami began to receive a "tremendous" amount of inquiries from people interested in licensing the Super Soaker and plaintiff referred them to LCI. Moreover, LCI began forwarding firm written proposals for licenses to Larami, covering areas from movies to television series, to swim wear, and watches. 6/22/94 Tr. at 64.

Also in February of 1992, the principals of Larami,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 9

Al Davis and Myung Song, already having experienced customer relations problems from defendants' conduct, became concerned that entering into licenses would invite more trouble in this "secondary market." *See* 6/22/94 Tr. at 79-80; deposition of Alfred Kahn ("Kahn dep.") at 42. Accordingly, on instructions from Davis and Song, Mr. Eigenbrode advised LCI to stop soliciting licensees.FN19

Larami's concerns about defendants' reaction to any attempts to license the Super Soaker trademark were well-founded. On March 30, 1992, counsel for TTMP wrote to Mr. Kahn of LCI and stated that TTMP "certainly believe[s] that the positions advanced by Larami Corporation do not justify the continuing use of the Super Soaker trademark in direct violation of legitimate trademark rights of Talk To Me Products." Exh. P-70. The letter further explained that TTMP was aware that LCI was seeking licensees for products under the Super Soaker trademark and that legal action would be taken against any company that used the "Soaker" name in any manner which was likely to suggest a sponsorship, or approval with TTMP or any of its licensees. *See* exh. P-70. LCI assumed from the letter that TTMP was "basically trying to scare [it] off the licensing program of Super Soaker." Kahn dep. at 28.

***12** In June of 1992, after approximately three months had passed in which Larami had not "tapped" into the secondary licensing market, Mr. Eigenbrode and Mr. Davis attended a licensing show in New York City. After the licensing show, Mr. Eigenbrode conveyed the following conclusion to the senior management of Larami,

[T]he bottom line is we missed the boat. The popularity of the item was so tremendous during the '91 and early '92 season, and not to be represented at this show where people-because its an annual licensing event, you only have one time-one year-one time to see our product and make a decision on it. And again remembering lead times for new products are probably six months to a year. So not being at that show, we really lost our golden opportunity.

6/22/94 Tr. at 73. In light of Mr. Eigenbrode's conclusion, Larami decided to go forward with the licensing program and "just recoup whatever [it could] ... whatever [Larami] could make on the license, [Larami] would be happy to take." 6/22/94 Tr. at 82. However, Mr. Kahn and Mr. Eigenbrode both agree that the demand for licenses that existed in February of 1992 had in large part dissipated by June of 1992. *See id.* at 74-76; Kahn dep. at 30-33.

I conclude from the aforementioned evidence elicited at trial that a reasonable jury could have concluded that the defendants' conduct was the proximate cause of damages to Larami in the secondary licensing market. FN20 There is sufficient evidence for a jury to have found once again that defendants were continuing their plan to wreak havoc on Larami's business relationships in an effort to make paying defendants a royalty seem like the "cheaper" alternative. A jury certainly could have found that as a direct and natural result of defendants' conduct, Larami was forced to make the difficult business decision to mitigate further harm by preventing the use of the Super Soaker trademark. Indeed, the jury could reasonably infer from the defendants' threats that defendants intended to frustrate Larami's attempts to further market the Super Soaker name unless they were given a royalty.FN21 In fact, there is little doubt that, if the evidence described above is accepted, a jury could find that Larami's actions were predictable and reasonably necessary. Regardless, I conclude that taking all of the evidence in a light most favorable to Larami, it was permissible for the jury to find that defendants' claim of infringement and threats of legal action *caused* Larami to stop licensing the trademark "Super Soaker." *See Hamil v. Bashline,* 392 A.2d 1280, 1284-85 (Pa.1978) (the issue of proximate cause should be taken from a jury "only where it is clear that reasonable minds could not differ on the issue"); *see also ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 969-70 (D.C.Cir.1990) (damages can include cost of advertising that actually responds to defendant's offending advertisements); *Burndy Corp. v. Teledyne Ind., Inc.,* 748 F.2d 767, 773 (2d Cir.1984) (plaintiff did not show that its price cut to its customers was made due to defendant's mislabeling of product).

***13** Defendants final argument pursuant to Fed.R.Civ.P. 50(b) relating to damages is that any prediction of damages based upon lost profits from the secondary licensing market was too speculative. As I instructed the jury, the fact that

... the precise amount of Larami's damages may be difficult to ascertain should not affect Larami's recovery, particularly if [the jury] find[s] that a defendant's wrongdoings [has] caused the difficulty in determining the precise amount.

While the damages may not be determined by mere speculation or guess, Larami will have satisfied its burden of proving the amount of its damages if the evidence shows the extent of its damages as a matter of just and reasonable inference, even if the result is only approximate. Proof of lost profits may be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 10

indirect and may include estimates based upon assumptions, but must be ascertainable.

June 24, 1994 transcript at 34-35. I find that when considered in the light most favorable to Larami, there is sufficient evidence to enable a reasonable jury to find that Larami established the amount of its lost profits as a matter of just and reasonable inference.

The unrebutted evidence proffered by plaintiff, if accepted by the jury, supports the conclusion that secondary licensing was, for a property like the Super Soaker trademark in early 1992, a proven opportunity for substantial profit. The evidence indicates that LCI, one of the top companies in the field of licensing, was "excited" about handling the Super Soaker trademark and saw it as a "very strong financial opportunity." 6/22/94 Tr. at 63; Kahn dep. at 23. Moreover, LCI represents clients whose properties have a certain potential to be successful in the licensing market and LCI chose to represent Larami for licensing of the Super Soaker mark. *See* Kahn dep. at 4, 9-10. Indeed, the Super Soaker's potential was confirmed when Larami received numerous inquiries from prospective licensees. *See* Kahn dep. at 4; 6/22/94 Tr. at 64.

Moreover, the testimony of Mr. Kahn and Mr. Osborne,[FN22] if accepted by the jury, reveals that in the field of toy licensing, a property can be expected to have a three-year life span and that the total gross sales of licensed products should equal the total sales of the primary product over its initial three years of sales. *See* 6/22/94 Tr. at 99-101. Importantly, Mr. Osborne testified that based upon his research, the Super Soaker was a viable property likely to follow these "rules of thumb and assumptions." *Id.* at 104-05; Kahn dep. at 19-22. Mr. Osborne stated that the royalties on licenses actually granted by Larami ranged from 8 to 12 percent of Larami's primary product sales, two-thirds of which would go to Larami, with the other third going to LCI. 6/22/94 Tr. at 111-12. Larami's share of these royalties would be profit, as all costs were borne by the licensee. *Id.* at 112-13.

The jury had before it the gross sales of the Super Soaker for the initial three year period of its sales and the actual licensing revenues for the first three year period of licensing. The jury simply needed to perform the mathematical calculation to figure out the difference between Larami's expected licensing profits from the actual amount received, *i.e.*, Larami's lost profits. [FN23] In addition, in his trial testimony, Mr. Osborne walked the jury through the appropriate calculations. *See* 6/22/94 Tr. at 99-117. From the evidence presented, and the *unrebutted* testimony of Mr. Osborne and Mr. Kahn, a reasonable juror could conclude that Larami lost significant profits due to the delayed entry into the secondary market of the Super Soaker trademark that was caused by defendants' improper conduct. *See e.g.*, 6/22/94 Tr. at 79-80, 95, 106-08; Kahn dep. at 31-36, 42. Moreover, I find that the testimony of Mr. Osborne, Mr. Kahn, and Mr. Eigenbrode discussed above, if accepted by the jury, could support the conclusion that the extent of Larami's damages could be determined by a just and reasonable inference, without resort to mere speculation.

### B. Motions For New Trial On Damages Pursuant To Fed.R.Civ.P. 59

***14** Defendants have moved for a new trial relating to the issue of damages on the basis that the jury's award was "shocking and against the weight of the evidence ..."[FN24] Defendant Amron's motion at 19. Defendants argue that the jury in this case reacted with passion and complete disregard for the evidence when it awarded plaintiff $10,000,000 in the face of evidence of only $7,956,812 in damages. Defendants conclude that because there is no rational relationship between the specific injury sustained and the amount awarded, a new trial must be granted.

While Larami admits that its damages expert opined that Larami may have suffered a lower amount of damage than awarded by the jury, plaintiff counters that the expert's estimate was based on several explicit, conservative assumptions and that the jury was not required to accept his conservative calculations. According to plaintiff, there was sufficient evidence in the record for the jury to find that the $10,000,000 damage award was appropriate. Because I agree with plaintiff that the testimony of Mr. Osborne could support an award of $10,000,000 in damages, defendants' motions shall be denied.

Generally, the granting of a new trial motion under Fed.R.Civ.P. 59 is committed to the sound discretion of the district court. *See* *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 812 (3d Cir.1984), *cert. denied*, 477 U.S. 908 (1986); *Windsor Shirt Co.*, 793 F.Supp. at 595. A less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law. *Slade v. Whitco Corp.*, 810 F.Supp. 396, 399 (N.D.N.Y.), *aff'd without op.*, 999 F.2d 537 (2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 11

Cir.1993). The Third Circuit has stated that a court should only exercise its discretion to grant a new trial on the basis that the verdict was against the weight of the evidence where a miscarriage of justice would result if the verdict were to stand, or where the verdict, on the record, cries out to be overturned or shocks the conscience. *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991); *China Resource Products, Ltd. v. Fayda Int'l, Inc.*, 856 F.Supp. 856, 862 (D. Del.1994); *Windsor Shirt Co.*, 793 F.Supp. at 595; *see also Slade*, 810 F.Supp. at 399 (A new trial is warranted if the district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.). In the context of a challenge to an award of damages as excessive, a new trial should not be granted when "[t]here [is] a rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir.1987).

In support of its claim for damages, Larami proffered the unrebutted testimony of Mr. Osborne. He testified that it was his opinion that Larami had suffered damages caused by defendants' actions "*in excess*" of 7.9 million dollars. 6/22/94 Tr. at 95 (emphasis added). Mr. Osborne explained that that figure was made up of two components-$51,812 in legal fees and $7,905,000 in lost royalty income due to the improper conduct of defendants. *Id.* at 95-96. The jury returned a verdict, it is to be recalled, in favor of Larami and against defendants in the amount of $10,000,000.

***15** Mr. Osborne, who as mentioned previously was qualified as an expert in investigative accounting and business damage analysis, testified that he arrived at his damage estimate only after applying certain conservative assumptions. As Mr. Osborne explained, even though Larami likely would receive a potential net royalty from the Super Soaker licensing in the amount of 5.4 percent to 8 percent, Mr. Osborne used only a 5 percent net royalty figure "to be conservative." *Id.* at 112. Mr. Osborne used a figure that fell below the actual range.

Applying the 5 percent figure to the $171,800,000 in Larami's primary product sales,[FN25] it translates into an estimated $8,590,000 that Larami would have received in royalties from licensing sales over the relevant three year period.[FN26] Had the jury decided to use the midpoint of Mr. Osborne's opinion of Larami's expected net royalty range, 6.7 percent, rather than 5 percent, that amount based upon 6.7 percent would have more than accounted for the difference between Mr. Osborne's ultimate conservative estimate and the final jury verdict of $10,000,000. After subtracting the actual royalties received by Larami of $685,000, the lost profits estimate after applying the 6.7 percent figure to Larami's primary product sales of $171,800,000 would be approximately $10,826,000.

The jury reasonably could have inferred from his testimony that Mr. Osborne was conservative in other aspects of his calculations. For example, Mr. Osborne used the 1990 to 1992 primary sales figure ($171,800,000) of Super Soaker products as a base for his calculation of royalties. As Mr. Osborne explained, it would have been reasonable to disregard the first year when sales were low because 1990 was a partial, start-up year and instead to use the primary sales for 1991 to 1993 which were approximately in the amount of $217,900,000.6/22/94 Tr. at 109-10; exh. D-34. Had Mr. Osborne applied a 5 percent royalty to this new base amount, it would have resulted in lost profits of $10,895,000. [FN27]

I find that the jury's award of damages was within the parameters of what the evidence showed was the amount of damages sustained by Larami. The jury was free to find that Larami's damage expert was conservative when performing his calculations and that as he explained, the damages sustained by Larami were likely to be in excess of his projections. Moreover, if his testimony was credited by the jury, it provided a firm range of likely harm created by defendants' conduct and the jury's award fell well within the minimum and maximum amounts. In addition, as to his base calculation of royalties, Mr. Osborne stated that one could apply a higher primary sales figure which would increase the damages in excess of $10,000,000. Because this Court cannot go behind the verdict to determine what approach the jury took in deciding the appropriate amount of damages, as long as the jury's award was within the parameters outlined by the *unrebutted* testimony of plaintiff's expert here, the verdict will not be disturbed. *See Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 488 (3d Cir.1984). Accordingly, because I find that the jury's award was within the parameters set out by the testimony of Mr. Osborne, defendants' motions shall be denied. This Court does not find that the jury's damages award was excessive or against the weight of the evidence and certainly, it would not result in a miscarriage of justice, or cry out to be overturned or shock the conscience.[FN28]

## III. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 12

***16** For the foregoing reasons, and upon consideration of the motions of defendants Alan Amron and TTMP for judgment as a matter of law and/or a new trial pursuant to Fed.R.Civ.P. 50 and 59, and the response of plaintiff thereto, having found that the evidence at trial was sufficient to sustain the jury's verdict, the motions of defendants shall be denied.

An appropriate Order follows.

ORDER

AND NOW, this 22nd day of March 1995, upon consideration of the motions of defendants Alan Amron and Talk To Me Products, Inc. for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, and/or a new trial pursuant to Fed.R.Civ.P. 59 (Document Nos. 78, 79), and the responses of the plaintiff Larami Corporation thereto, and for the reasons stated in the attached memorandum, it is hereby ORDERED that the motions are DENIED.

This is a final disposition of all claims.

FN1. Plaintiff also brought claims seeking declaratory relief and punitive damages. On March 11, 1993, this Court granted the motion of Larami for partial summary judgment relating to its request for an order declaring that the Super Soaker water guns did not infringe defendant TTMP's patent in Count I of the amended complaint, and dismissed without prejudice plaintiff's claim in Count II (Document No. 32). At trial, this Court granted defendants' motion for directed verdict in their favor and against plaintiff relating to plaintiff's claim for punitive damages in Count VII of the amended complaint.
The parties do not dispute that Pennsylvania law applies to plaintiff's common law claims. *See* plaintiff's supp. trial memo. and proposed jury instructions; co-defendants' amended pretrial memo. and co-defendants' proposed jury instructions.

FN2. Defendants Amron and TTMP each filed separate motions pursuant to Fed.R.Civ.P. 50 and 59. Defendant TTMP joined in the motion of defendant Amron and incorporated his memorandum. Both defendants failed to comply with Loc. R. Civ. P. 20(a) and (c) as their motions were not accompanied by forms of order and separate briefs containing concise statements of the legal contentions and authorities relied upon in support of their motions.

FN3. Fed.R.Civ.P. 50 was amended in 1991. The Rule no longer provides for the entry of a "J.N.O.V.", rather, it now provides for the entry of "judgment as a matter of law." The Advisory Committee's Note reveals that the 1991 amendments were intended, *inter alia,* to overrule a line of cases which had held that a motion at the close of all the evidence pursuant to Rule 50(a) was not an absolute prerequisite to maintaining a post-verdict motion under Rule 50(b). The 1991 amendments to Rule 50 did not alter the law in the Third Circuit, however, because it has always been the law here that a Rule 50(a) motion at the close of all of the evidence is required for a court to entertain a Rule 50(b) motion after a verdict. *See* *Garrison v. Mollers North America, Inc.,* 820 F.Supp. 814, 818 n. 3 (D. Del.1993).

FN4. The Seventh Amendment provides, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

FN5. On June 23, 1994, defendants moved for a directed verdict at the close of the plaintiff's case relating to Counts III through VII of the amended complaint. After the motion was denied as to Counts III through VI, defendants called Alan Amron as a witness in support of their case. At the end of Mr. Amron's testimony, the defendants rested. They never renewed their motion for directed verdict.

FN6. The cases cited by defendants all concern the *adequacy* of motions for directed verdict which were made at the close of all the evidence. The instant case involves a wholly different situation because defendants have not performed *any* acts that could be construed as a motion for directed verdict. *See* *Trujillo v. Goodman,* 825 F.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 13

1453, 1455-56 (10th Cir.1987) (court considered motion for judgment n.o.v. where not clear whether plaintiff originally sought directed verdict); *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 888 n. 3 (5th Cir.1984), *cert. denied*, 469 U.S. 1160 (1985); *Villanueva v. McInnis*, 723 F.2d 414, 417 (5th Cir.1984) (where defendant made a motion for directed verdict at close of plaintiff's case and objected to instructions, conduct was sufficient to preserve right to motion under Rule 50(b)); *Acosta v. Honda Motor Co.*, 717 F.2d 828, 831-32 (3d Cir.1983) (defendants made motions for directed verdict after plaintiff's case and after close of all evidence, issue dealt with specificity of latter motion); *but see Mallick v. Int'l Broth. of Elec. Workers*, 644 F.2d 228, 234 (3d Cir.1981) (in Third Circuit, request for binding instruction will satisfy prerequisite for judgment n.o.v. only when court explicitly treats and rules on the request as though it was a motion for directed verdict).

FN7. The Seventh Amendment prohibits the courts of the United States from re-examining any facts tried by a jury otherwise than according to the rules of the common law. The only modes known to the common law to re-examine such facts were the bringing of a new trial by the court or by granting a motion for a directed verdict. *Mutual Ben. Health & Accident Ass'n v. Thomas*, 123 F.2d 353, 355 (8th Cir.1941). "It is only where a litigant has made motion for a directed verdict that he may ask the court to enter judgment non obstante veredicto. It is only in this manner that the question may be re-examined as a question of law. To ask the court to enter a judgment, contrary to a general verdict of the jury where no motion for a directed verdict has been interposed, is simply to ask the court to re-examine the facts already tried by the jury, and this the court may not do without violating the Seventh Amendment." *Id.*

FN8. Defendants claim that the evidence is insufficient to demonstrate that defendants, (1) intended to harm Larami by preventing completion or creation of a contract as required to establish a claim for intentional interference with existing and prospective contractual relations; (2) intended to cause monetary loss to Larami or reasonably should have recognized that its conduct would cause such harm to Larami as required to establish a claim for commercial disparagement and an abuse of privilege relating to plaintiff's claim for defamation; and (3) did not have a reasonable good faith belief in the merits of their claims as required to prove a claim for intentional interference with existing or prospective contractual relations and to prove that the defendants were not privileged to communicate their allegedly defamatory message.

FN9. Defendants have not raised a post-trial objection to the jury's consideration of the denial of the defendants' trademark or patent infringement claim.

FN10. The jury also could have concluded that Mr. Amron did not believe that the Super Soaker infringed the Esposito patent based upon Mr. Amron's testimony. Mr. Amron stated that defendants relied on the doctrine of equivalence, which Mr. Amron understood to mean that "if it's made substantially the same way to get substantially the same result, substantially the same way [sic], it would be infringing." 6/23/94 Tr. at 104. It was reasonable for the jury to find that based upon the physical and oral descriptions of the two guns, Mr. Amron could not have concluded that the Super Soaker infringed the Esposito patent even under his own test.
Moreover, the pre-trial finding of this Court that the Super Soaker water guns did not infringe the Esposito patent also provides support for the jury's conclusion. *See supra* note 1.

FN11. Moreover, the language of the letter, when taken in the light most favorable to the plaintiff, could support a conclusion that TTMP sought to injure Larami's business, rather than just to notify suspected infringers of the potential infringement. The letter stated that TTMP will be seeking permanent injunctions preventing all shipments of these goods into the United States. This statement is significant because Larami is an "LC" company and, therefore, its customers actually purchase Larami's goods and take possession of them at the time and place of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 14

shipment-Hong Kong. *See* 6/21/94 Tr. at 60. The customer is responsible for getting the goods to the United States. It is permissible to infer, because of his exposure to the toy industry and to Larami's practices and procedures, that Mr. Amron knew that Larami's major retailers would be extremely concerned by the threat of an injunction of this sort because the retailers would be prevented from shipping goods that *they* already owned into the United States.

FN12. Defendants' attempt to demonstrate their good faith by noting that all the letters and notices were reviewed by counsel before they were sent is ineffectual. First, just because these letters and notices were approved by counsel does not prevent a reasonable factfinder, in light of all the other circumstances, from concluding that defendants acted in bad faith. Second, the counsel for defendants to whom they relied for patent and trademark advice had a financial interest relating to the Esposito patent. *See* 6/23/94 Tr. at 191-95, 198.

FN13. Moreover, because the evidence to which defendants cite consists mainly of testimony by defendant Amron and the issue of credibility is for the jury to determine, defendants' citations do not warrant the issuance of judgment as a matter of law. *See* *Windsor Shirt Co., 793 F.Supp. at 595;* plaintiff's opp. at 14-19.

FN14. While it was clear to the Court that the statements of defendants were capable of a defamatory meaning and, accordingly, this claim was permitted to go to the jury, this Court did not make an express finding as such. Accordingly, this Court takes this opportunity to make such a finding at this time to satisfy its obligation under the law. *See* *U.S. Healthcare, Inc.*, 898 F.2d at 923.

FN15. The argument of defendant TTMP that plaintiff cannot obtain attorney's fees under 35 U.S.C.A. § 285 (West 1984) and 15 U.S.C.A. § 1117(a) (West supp.1994) because it has not demonstrated the existence of "exceptional circumstances" misses the point. Plaintiff did not seek attorney's fees as the prevailing party of any trademark or patent infringement action under a federal statute. Rather, Larami is entitled to recover legal expenses incurred in collateral legal proceedings where defendants' tortious conduct forced Larami to defend its customers and to indemnify them.

FN16. The Court has reviewed the testimony of Mr. Osborne and has previously found him to be qualified as an expert in investigative accounting and business damage analysis, including evaluation of legal fees. June 22, 1994 transcript ("6/22/94 Tr.") at 89-90.

FN17. This agreement excluded the actual water gun toys and toy extensions produced by Larami, but included all trademarks, copyrights, artwork and other elements owned by Larami in connection with the Super Soaker concept.

FN18. Approximately four days after the signing of the agreement with LCI, defendants disseminated yet another notice to toy buyers and manufacturers regarding the dispute over Larami's patent and trademark rights in the Super Soaker product. *See* exh. P-67.

FN19. The fact that Mr. Alfred Kahn, CEO of LCI, who testified by videotape deposition, and Mr. Ray Eigenbrode, Larami's consultant, have differing recollections regarding whether Larami stopped the licensing of the Super Soaker after or prior to the February of 1992 Toy Fair is of no significance here. *See* 6/22/94 Tr. at 71; Kahn dep. at 42. First, it is for the jury to determine which person's testimony to credit. Second, Larami declined to enter into any licenses until June of 1992 so the jury could have concluded that its damages would have been incurred regardless of whether Larami had participated in the toy fair. *See e.g., id.* at 73.

FN20. Defendants suggest that the signing of the contract with LCI in February of 1992 proved that Larami was no longer concerned about defendants' conduct after that date and, therefore, Larami's alleged reason for holding back from the secondary market is false. *See* defendant Amron's motion at 17. This is an argument for the jury. There was sufficient evidence to establish, if accepted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073
**(Cite as: Not Reported in F.Supp.)**

Page 15

by the jury, that the principals of Larami withdrew from participating in a secondary market due to the continuing risk from defendants' conduct. Indeed, as noted above, as late as *February 10, 1992* and only four days after the LCI contract was signed, TTMP sent out a notice regarding the dispute over Larami's patent and trademark rights in the Super Soaker name and concept. *See* exh. P-67.

FN21. Defendants' suggestion that plaintiff was somehow obligated to go forward with the licensing contract and to indemnify its customers from any costs incurred due to defendants' conduct is unpersuasive. First, the issuance of indemnities to customers does not prevent harm to Larami's reputation caused by defendants' statements. Second, there is sufficient evidence for a jury to conclude that Larami's conduct was reasonable and that is was a natural, direct and foreseeable consequence of the defendants' actions. Indeed, the jury could infer from the defendants' conduct that they intended to cause plaintiff to act in such a way. Simply, Larami was not under any obligation to choose the option that defendants believe was the better business decision.

FN22. As mentioned earlier, I have previously found Mr. Osborne to be qualified as an expert in investigative accounting and business damage analysis. Moreover, based upon Mr. Kahn's twenty-five years of experience in the toy business, and specifically, over fifteen years in product marketing and development, I find that a reasonable jury could rely upon his conclusions if they accept the bases underlying them. *See* Kahn dep. at 4-8.

FN23. The actual calculations will be disclosed and discussed *infra* part II.B.

FN24. Defendant TTMP states a second ground for its motion for new trial under Fed.R.Civ.P. 59. TTMP argues that the jury's finding of causation was unsupported by the evidence. Based upon the preceding discussion, the motion of defendant TTMP is denied as to this ground as well.

FN25. Remember, according to Mr. Osborne, there is usually a one-to-one relationship between primary product sales and sales of licensed products.

FN26. Because Larami received $685,000 in royalties, Larami's estimated net lost profits were in the amount of $7,905,000.

FN27. Again, because Larami has already received $685,000 in royalty payments, the lost profits for which it would be entitled would be $10,210,000.

FN28. In support of their argument that the verdict was so excessive so as to appear more punitive than compensatory, defendants cite to the alleged comments of juror number three in the hall outside the courtroom after the verdict was rendered. According to defendants, juror number three stated that the jury arrived at the $10,000,000 figure to "send a message." Defendant Amron's motion at 20-21 n. 7. It is well settled that the jury's deliberative processes are not legally cognizable, except where subject to "extraneous influences." *Van Buskirk,* 760 F.2d at 488; *Friedman v. F.E. Myers Co.,* 710 F.Supp. 118, 120 (E.D.Pa.1989); *see also* Fed.R.Evid. 606(b). In the Third Circuit, when matters such as envy, bias, and prejudice result only from intra-jury influences, they will not support the grant of a new trial. Because defendants have not alleged that the jury's verdict was the result of extraneous influences, defendants' argument is ineffectual. For examples of "extraneous influences," see *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148-50 (3d Cir.1975), *cert. denied,* 424 U.S. 917 (1976).

E.D.Pa. 1995
Larami Corp. v. Amron
Not Reported in F.Supp., 1995 WL 128022 (E.D.Pa.), 36 U.S.P.Q.2d 1073

Briefs and Other Related Documents (Back to top)

• 2:91CV06145 (Docket) (Sep. 30, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT B**

Westlaw.
Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
STAR CREATIONS INVESTMENT CO., LTD. f/k/a Larami Corporation, Plaintiff,
v.
**ALAN AMRON** DEVELOPMENT, INC., and Eileen **Amron**, Defendants.
**No. CIV. A. 95-4328.**

Aug. 18, 1995.

MEMORANDUM OF ADJUDICATION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ISSUANCE OF PRELIMINARY INJUNCTION

REED, J.

***1** Before this Court for consideration is the motion of plaintiff Star Creations Investment Co. for a preliminary injunction against Alan Amron Development, Inc. ("Development, Inc.") only (Document No. 2) [FN1]. Having found that Development, Inc. is attempting to proceed pro se and therefore has not obtained counsel, and having found below that, as a result, an officer and directors of the Development, Inc. were provided with notice of the motion and hearing, and after a hearing was held on August 11, 1995 in which only plaintiff and its counsel participated, and having found that plaintiff Star Creations Investment Co.[FN2] holds a valid judgment of this Court in the amount of $10 million, jointly and severally against Alan Amron ("Mr.Amron") and a company Mr. Amron was formerly associated with, Talk To Me Products, Inc. ("TTMP"), which was entered on July 22, 1994 in the Underlying Case,[FN3] and having found that plaintiff's efforts to execute upon or enforce its judgment in the Underlying Case have yielded no results to date, see N.T. at 66, the Court makes the following:

I. Findings of Fact

1. The well-pleaded allegations of the complaint show that plaintiff is a citizen of Delaware and defendants are citizens of Florida and New York. The amount in controversy is alleged to exceed $50,000. (Complaint, ¶¶ 1-4.).

2. It is evident from the motion to dismiss of Eileen Amron and Development, Inc. signed by Eileen Amron, a member of the Board of Directors of Alan Amron Development, Inc., that Eileen Amron has received a copy of the complaint. It is also evident from the record that a copy of the complaint and waiver of summons forms were received by Eileen Amron. *See* Document No. 5. Eileen Amron and Development, Inc. refused service of another copy of the summons and complaint that were sent later. *See* Document No. 11. The record also demonstrates that the motion for preliminary injunction, the July 28, 1995 scheduling order, and the plaintiff's first request for production of documents were received by an individual at Eileen and Alan Amron's ("Mr.Amron") residence. Eileen Amron's motion to dismiss also indicates that she had notice of the hearing in this matter (Document No. 4).

3. No attorney has appeared in this action for Development, Inc., and no representative of Development, Inc. appeared at the preliminary injunction hearing. Development, Inc. has purported to file, however, a pro se "Motion to Dismiss, Presenting Defenses of Failure to State a Claim, or Lack of Service of Process, Lack of Personal Jurisdiction Under Rule 12(b), and Improper Venue" (hereinafter the "Motion to Dismiss").

4. Because defendant has failed to appear, plaintiff has sought to make out its case for a preliminary injunction largely through documentary evidence. Some of plaintiff's proffered exhibits are discovery materials, records of this court or are otherwise self-authenticating. (P-44, 47, 49, 50, 51, 52 & 53). The remainder of the exhibits, however, are documents received by plaintiff in the course of discovery-in-aid of execution in the Underlying Case relating to Development, Inc., Mr. and Mrs. Amron, TTMP, RASCO Refrigeration Alarms Corp. and RASCO Temperature Alarms, Inc. which plaintiff offers as business records.

***2** 5. The first basis for the admissibility of plaintiff's exhibits is that, pursuant to paragraph 5 of the Scheduling Order, plaintiff provided Development, Inc. with pre-marked copies of its exhibits P-1 through P-46. Consistent with its evident decision not to comply with the Court's July 28, 1995 scheduling order, Development, Inc. neither reciprocated nor lodged any objections to plaintiff's exhibits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

Moreover, as Development, Inc. did not participate in the hearing held August 11, 1995, Development, Inc. did not object to the introduction of plaintiff's exhibits into evidence.

6. A second basis for the admissibility of plaintiff's exhibits is that plaintiff's counsel testified under oath in detail how each of the proffered exhibits was given to him personally in response to discovery requests served by plaintiff in aid of execution in the Underlying Case. Indeed, the bulk of these documents were presented to plaintiff's counsel in a personal meeting with Mr. Amron, an officer and director of Development, Inc., and his counsel in the Underlying Case, where it was represented by Mr. Amron that the documents being produced were authentic business records. Others were provided to plaintiff's counsel at the offices of TTMP, where he was permitted to review the company's business records on the premises and remove them for copying. (N.T. at 54-61). This Court credits the testimony of counsel for plaintiff that these documents were provided as authentic business records. Based upon the testimony of counsel for plaintiff, this Court also finds that the exhibits of plaintiff have a sufficient indicia of trustworthiness and reliability to justify admission into evidence.

7. Plaintiff holds a valid judgment of this Court in the amount of $10 million jointly and severally against Alan Amron. This judgment was entered in the Underlying Case upon a jury verdict after a six-day trial finding that both defendants had violated Section 43(a) of the Lanham Act, had tortiously defamed and commercially disparaged plaintiff, and tortiously interfered with its existing and prospective contractual relations. (P-47).

8. Prior to May 1991, Mr. Amron was the sole shareholder of a company named Talk To Me Programs, Inc. which was in the business of developing and licensing toy concepts, and enforcing intellectual property rights therein. (P-25 at 2). Mr. Amron's interest in Talk To Me Programs, Inc. yielded substantial income to him and his 100% ownership interest was a valuable asset. (P-28-P-35).

9. In May of 1991, Mr. Amron created a new corporation, TTMP, together with Roy Peshkin and Mel Gale. The assets of Talk To Me Programs were sold to TTMP. Peshkin and Gale each paid $137,500 for one-third of the stock of TTMP. (P-22 at 2).

10. TTMP is or was "engaged in the business of owning and licensing patents, developing and

marketing new products and protecting licensed products." (P-22 at 1). The products developed and licensed by TTMP were for the most part toys. (P-25, 26 & 27).

*3 11. Mr. Amron describes himself as an inventor and a person with valuable commercial relationships with other inventors and a good reputation in the toy industry. (P-24 at 3; P-25 at 8). While still associated with TTMP, he stated in a sworn affidavit that "I am not only the President of TTMP, but I am TTMP's chief asset: the sole creative force behind TTMP. The remaining assets are the existing licenses and the contracts with other inventors, all of whom came to TTMP through me." (P-24 at 2). Peshkin acted as TTMP's general manager and was in charge of the financial aspects of the business. (P-22 at 5).

12. Mr. Amron contributed to TTMP his experience and know-how in the toy business and in return received one-third of its stock. (P-22 at 2-3). TTMP was the successor to the business of Talk To Me Programs. (P-22-P-27).

13. As part of its efforts to collect upon its judgment, plaintiff garnished several of TTMP's licensees, only to find that the royalty stream for the licensed products had already ended.

14. On average, the royalty stream on a toy license will last three years. (N.T. at 66).

15. As part of its efforts to collect upon its judgment, plaintiff served comprehensive interrogatories in aid of execution upon Mr. Amron. Mr. Amron's sworn answers reveal virtually no assets from which any part of plaintiff's judgment could be satisfied. (P-44).

16. In response to an interrogatory requesting information about any interests he has held in patents, trademarks, copyrights or licenses since 1990, Mr. Amron responded in pertinent part:
[S]ince January 1, 1990, Mr. Amron was employed by three separate companies, [Talk To Me Programs], [Talk To Me Products] and [Alan Amron Development, Inc.]. TTMP assigned all of its rights to TTMP when Mr. Amron became a shareholder of TTMP. Mr. Amron's employment agreement required him to assign any intellectual property rights in any of his inventions directly to the corporate entity from their inception. Mr. Amron never "held" any interest in such intellectual property, only TTMP and/or AAD [Development, Inc.] did. (P-44 at 22).

17. Martin Rotindo, plaintiff's chief financial officer,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

testified that, notwithstanding his regular contacts in the toy industry, he had never heard of Alan Amron Development, Inc. prior to receiving a copy of Mr. Amron's interrogatory answers. (N.T. at 67).

18. Mr. Amron's joint venture with Peshkin and Gale was initially quite lucrative for him. He received over the course of the first year in 1991, $175,000 for the assets of Talk To Me Programs, $25,000 in salary, a $25,000 bonus and a $35,000 distribution of profits. (P-22 & 25).

19. However, Mr. Amron's relationship with Gale and Peshkin quickly deteriorated and by late 1992 he instituted proceedings for the dissolution of TTMP. Mr. Amron ceased receiving any income from TTMP. (P-23, 24, 25 & 26).

20. By December 1992 and January 1993, Mr. Amron was in "dire financial straits" and "on the brink of total financial ruin." (P-24 at 2-3).

***4** 21. In December 1992, plaintiff filed a pretrial statement in the Underling Case in which it stated that the damages it would seek against Mr. Amron exceeded $2 million and that:

Because these damages are in the nature of lost profits, an exact calculation is not possible. Larami expects to introduce testimony proving that the damages are no less than $2.7 million, and could be as high as $9.2 million. Larami's analysis is ongoing. (P-49 at 8).

Upon filing, a copy of this pretrial memorandum was served upon Mr. Amron's counsel in the Underlying Case. *See* Document No. 30, Civ. Action No. 91-6145.

22. In or about December of 1992, Mr. Amron commenced a series of actions designed to shield himself and his assets from the claims of his creditors.

23. Prior to December 1992, Mr. Amron was the sole shareholder of a company named RASCO Refrigeration Alarms Corp. which was in the business of marketing refrigeration alarm devices. Mr. Amron's interest in RASCO Refrigeration Alarms Corp. yielded substantial income to him. (P-38 & 39).

24. In December 1992, a new company named RASCO Temperature Alarms, Inc. was incorporated in Florida by Mr. Amron's father, who received 100% of the stock for par value without making any contribution to capital.[FN4] Mr. Amron became an employee of this company. (P-40, 41 & 42).

25. In January 1993, a new company named Alan Amron Development, Inc. was incorporated in Florida by Mr. Amron as incorporator. (P-1). Mr. Amron's wife, Eileen Amron, received 100% of the stock for par value without making any contribution to capital.[FN5] The business of Development, Inc., like TTMP and Talk To Me Programs before it, was to develop and license toy concepts. (P-1 & P-18).

26. Mr. Amron was named President and Director of Development, Inc. (P-1), [FN6] and he signed a document titled "Alan Amron/Alan Amron Development, Inc. Agreement" which provided in relevant part as follows:

As of today, January 27, 1993, I, Alan Amron agree to work for Alan Amron Development, Inc. as president. I agree to transfer, and/or assign, 100% of all of my inventions, concepts, designs, patents pending, patents, trademarks, copyrights, agreements and/or all revenue I generate, as well as, other properties that I bring in from outside sources, in exchange for financial compensation.

The "Alan Amron/Alan Amron Development, Inc. Agreement," is on its face a unilateral assertion not signed by Development, Inc. and contains no terms regarding the amount of "financial compensation" Mr. Amron was to receive. (P-10). In fact, his compensation for 1993 was $11,500. (P-5).

27. "Alan Amron Development, Inc." was evidently so named in order to capitalize on Mr. Amron's valuable reputation in the toy industry. According to the minutes of the first Board of Directors' meeting, Mr. Amron's role as President would be to "cultivate and establish business ties for new products." Mrs. Amron's role was to oversee the business and financial aspects. (P-1). Thus, Mr. Amron's role in Development, Inc. was to be essentially the same as his role in TTMP where he and his business contacts were the "chief asset."

***5** 28. Development, Inc. operates out of Mr. Amron's residence at 170 Berryhill Road, Syosset, New York (P-5 at 1-2; P-6 at 1; P-37 at 1), as does RASCO Temperature Alarms, Inc. (P-5 at 4; P-41 at 8), and it uses the same post office box-Box 42, Woodbury, N.Y. (P-18)-which has previously been used by Talk To Me Programs, Inc. (P-29 at 1), RASCO Refrigeration Alarms Corp. (P-39 at 1) and Mr. Amron (P-43) individually. That box number is also used by RASCO Temperature Alarms, Inc. (P-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

42).

29. Although Development, Inc.'s deposit records for the period March 1993 through mid-October 1994 do reflect that Mrs. Amron is the source of some funding, there was far more money deposited by RASCO Temperature Alarms, Inc., the company nominally owned by Mr. Amron's father, by which Mr. Amron was also employed. (P-48 & 42). Although the bookkeeping treatment of these deposits is not clear, Development Inc.'s records indicate that funds received from Mrs. Amron and RASCO Temperature Alarms, Inc. may have been distribution of RASCO income to Development, Inc. or were treated as interest-free loans to Development, Inc. (P-16; P-41 at 16-17).

30. In accordance with the so-called "agreement" set forth in finding of fact ¶ 26 above, Mr. Amron has assigned to Alan Amron Development, Inc. substantial amounts of revenue-generating intellectual property in exchange for only a small salary. (P-5, 9, 11, 18 & 44).

31. In addition, as part of TTMP's buy-out of Amron's shares, TTMP agreed to assign to Mr. Amron its interest in certain patents "belonging to his children." (P-26 at 5). More than a year earlier, Joanna Amron had assigned her patent in a "basketball goal simulator" to TTMP. (P-12 at 6). Rather than personally take an assignment of this patent as he was entitled to under the TTMP settlement, Mr. Amron had TTMP assign it to Development, Inc. (P-12 & 26). Development, Inc. paid no compensation to either Mr. Amron or TTMP for the assignment of these rights; rather it agreed to pay Joanna Amron for the assignment of rights that were not her's to assign. (P-15).

32. Among the concepts that Development, Inc. has developed and licensed through the efforts and contacts of Mr. Amron is the "Shout N' Shoot" voice-activated water-shooting helmet. Mr. Amron developed the trademark "Shout N' Shoot," for which he applied for federal registration in his own name at his own expense (P-21 & P-50), and he brought to Development, Inc. one of the inventors, Sam Cottone, and the licensee, CAP Toys, both of whom he had dealt with in the licensing of another toy while at TTMP prior to incorporating Development, Inc. (P-18, 19 & 20).

33. Mr. Amron's declaration in connection with the "Shout N' Shoot" trademark application provides that "he believes he is the owner of the mark sought to be registered [and] that the applicant has a bona fide intention to use the mark in commerce in connection with the goods so identified [a voice responsive ejecting toy] through a related company." (P-50 at 4). Despite this, Mr. Amron and Development, Inc. have been less than candid in acknowledging his role in this successful product. In his interrogatory answers in the Underlying Case, Mr. Amron omitted any mention of "Shout N' Shoot" or voice responsive ejecting toys from the list of properties he had assigned to Development, Inc. (P-44 at 22-23). In her affidavit in connection with her motion to dismiss, Mrs. Amron categorically states "ALAN AMRON had absolutely nothing to do with creation of this product nor the patent issued thereon." (Amron Aff., ¶ 35). I do not credit the assertion of Mrs. Amron.

***6** 34. Development, Inc.'s royalty revenues have been substantially derived from the licensing of product concepts assigned to it by or on behalf of Mr. Amron-including the "Shout N' Shoot" license to Cap Toys, the "Twirler Pops" license to Bee International and the "Air Ball Shooter" license to the "Original Toy Makers of San Francisco". (P-18 & 48).

35. These revenues have been commingled with Mr. Amron's personal funds and have been used to pay Mr. Amron's and Eileen Amron's personal expenses, including such personal items as cable television, their children's tuition bills, groceries and medical bills. A single checking account appears to serve as that of both Development, Inc. and the Amron household. (P-16). Mr. Amron apparently has check-signing privileges in his capacity as an officer. (P-1 at 6 & P-46 at 2).

36. The Underlying Case was tried in this Court from June 20 to June 27, 1994. Development, Inc. was not a party to the Underlying Case, which related to events that occurred prior to Development, Inc.'s incorporation. Nonetheless, during the period from May 31, 1994 to July 20, 1994, Development, Inc. paid for more than $7000 in expenses relating to Mr. Amron's defense of himself in that proceeding, including attorneys' fees and transcript costs. (P-16 at 17-21).

37. Conversely, Mr. Amron also used his personal funds to cover expenses of Development, Inc. (P-46).

38. Under the umbrella of Development, Inc., Mr. Amron is simply carrying on, for little compensation and no equity, the same business for which he previously earned substantial income and built

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

substantial shareholder value for himself with Talk To Me Programs and Talk To Me Products.

39. Plaintiff has shown a reasonable probability of success on the merits of its factual claim that Development, Inc. is a sham designed to shield Mr. Amron's only valuable assets-his ideas, his contacts with other toy inventors, manufacturers and sellers and his intellectual property rights-from the claims of his creditors, and in particular from execution upon the $10 million judgment of plaintiff in the Underlying Case.

40. Plaintiff has shown a reasonable probability of success on the merits of its factual claim that Development, Inc. is merely a conduit by which Mr. Amron can draw money for his personal expenses or provide income to family members on an "as needed" basis while the income-generating assets themselves remain completely insulated from the claims of his creditors, and in particular from execution upon the $10 million judgment of plaintiff in the Underlying Case.

41. Plaintiff has shown a reasonable probability of success on the merits of its factual claim that Development, Inc. has received Mr. Amron's assets for less than reasonably equivalent value.

42. On this record, I find that plaintiff has demonstrated that there is a reasonable probability that plaintiff will be able to show that Mr. Amron transferred property to Development, Inc. with actual intent to hide the property from creditors or hinder creditors' collection efforts. For the same reasons that this Court concludes that Development, Inc. is Mr. Amron's alter ego, see conclusions of law ¶ ¶ 29-31, this Court finds that the transfers were to an insider and that Mr. Amron retained control after the transfer. At the time of the initial transfers to Development, Inc., Mr. Amron was a defendant in the Underlying Case, in which plaintiff had already stated and Mr. Amron knew that it would seek a multi-million dollar award. *See* finding of fact ¶ 21. Mr. Amron, by his own statement, was in dire financial straits and near total financial ruin at the time. His interrogatory answers indicate that his intellectual property rights constituted substantially all of his assets. And finally, the transfer was not for reasonably equivalent value. *See* finding of fact ¶ 30.

*7 43. In light of the timing of events, it is clear that Mr. Amron sought to protect his assets from plaintiff and, perhaps, other smaller creditors. The fraudulent intent of the transfers is clear. Even if Mr. Amron had a justifiable desire to incorporate his business, the fact that he took no ownership interest, but instead gave it to a family member, is an indicia of fraud. No "innocent" explanation has been presented. Moreover, the transfer to Development, Inc. is not an isolated incident-it appears that Mr. Amron similarly transferred his interest in the refrigeration alarm business to his father at the same time.

44. Plaintiff has also shown a reasonable probability of proving that transfers from Mr. Amron to Development, Inc. were made without receiving reasonably equivalent value in exchange at a time when Mr. Amron "intended to incur, or believed or reasonably should have believed" that he would incur debts that he was incapable of paying when due. The only consideration which is mentioned in connection with the transfers by Mr. Amron to Development, Inc. is an agreement to pay some future, undefined compensation. *See* finding of fact ¶ 26. This turned out to be only $11,500 in salary during 1993. *See* finding of fact ¶ 26. Moreover, Development, Inc.'s revenues appear to derive mostly from Mr. Amron's intellectual property. *See* finding of fact ¶ 34. This Court finds that Mr. Amron did not receive "reasonably equivalent value" when there was returned to Mr. Amron a portion of revenue Mr. Amron's property generated, because without the transfer, Mr. Amron would have been entitled to all of those revenues. Moreover, it does not appear from the documents of record that Development, Inc. invested its own capital to bring Mr. Amron's concepts to market, thereby entitling it to the revenues generated.

45. Plaintiff will suffer irreparable harm if the injunction here does not issue. Mr. Amron's interrogatory answers make it clear that it would be nearly impossible for plaintiff to satisfy any portion of its judgment if the preliminary relief sought in this case is not granted. (P-44). If left unrestrained, Development, Inc. will be free to further transfer assets and plaintiff will be forced to chase those assets through lawsuit after lawsuit. This Court finds that based upon Mr. Amron's prior conduct, if no restraints on Development, Inc.'s ability to transfer or dissipate assets are imposed, it is likely that he will continue to create corporate structures and devices in an effort to delay satisfying the judgment against him, or in the alternative, to completely dissipate his assets to be used to satisfy plaintiff's judgment against him. According to the testimony of Mr. Rotindo at the hearing that I credit, plaintiff has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

undertaken significant efforts to collect under its judgment, and this Court finds it likely that without an injunction, plaintiff will be exposed to significant additional expense to obtain payment from Mr. Amron. *See* findings of fact ¶¶ 14, 15.

***8** 46. Testimony at the hearing which this Court credits indicates that the irreparable harm to plaintiff from further delay is heightened because the principal assets that plaintiff could hope to execute on are toy licenses which have limited lifespans of approximately three years. *See* finding of fact ¶ 14. In these circumstances, plaintiff's remedy at law is ineffectual.

47. The preliminary injunction extends only to royalties and other income from products developed in whole or in part by Alan Amron. Development, Inc. will otherwise be free to carry on any business it wishes.[FN7] Moreover, the posting of a significant bond and scheduling of a prompt final hearing on the merits will protect defendant against any possible harm.

## II. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $50,000. *See* finding of fact ¶ 1.

2. The law in this Circuit is clear that a corporation may not appear pro se. *Simbraw, Inc. v. United States*, 367 F.2d 373 (3d Cir.1966). Accordingly, the Court finds that no cognizable cross-motion or other response to plaintiff's motion has been made by Development, Inc.[FN8] *See* finding of fact ¶ 3.

3. Moreover, it is well-settled that a court has jurisdiction to determine its own jurisdiction. *Atlantic City Municipal Utilities Authority v. Regional Administrator*, 803 F.2d 96, 103 (3d Cir.1986). Thus, even if Development, Inc. had made a cognizable motion to dismiss, this Court's July 28, 1995 scheduling order for Preliminary Injunction, which set a hearing date for August 11, 1995 and established various pre-hearing requirements and deadlines, an Order which Development, Inc. had notice of, was binding and enforceable. [FN9]

4. Nonetheless, because there has been no clear waiver of objections to personal jurisdiction and any preliminary injunction entered in the absence of personal jurisdiction would be subject to collateral attack, the Court will undertake to examine the issue of personal jurisdiction *sua sponte*.

5. The record reflects that on July 14, 1995, plaintiff attempted service upon Development, Inc. pursuant to Fed.R.Civ.P. 4(d) by sending Development, Inc. the complaint accompanied by Waiver of Summons forms by Federal Express. *See* Document No. 5. Although actual delivery of the complaint is not disputed, plaintiff did not properly attempt service as provided in Fed.R.Civ.P. 4 and Pa.R.Civ.P. 403 and 404(2). Defendants did not accept service. *See* finding of fact ¶ 2.

6. The record further reflects that on August 9, 1995 plaintiff attempted service of the summons and complaint on Development, Inc. by United States Express Mail, Return Receipt Requested, a form of service on foreign corporations permitted under Pennsylvania Rules of Civil Procedure 404(2) and 403, and therefore under Fed.R.Civ.P. 4(e)(1) and 4(h)(1). The Postal Service returned this package to plaintiff's counsel with notations that delivery was attempted on August 10, 1995 but was refused. *See* finding of fact ¶ 2.

***9** 7. In the context of preliminary injunctive relief, the requirement of personal jurisdiction

must be read simply in terms of *notice* to the enjoined party ... rather than as demanding the existence of in personam jurisdiction via service of process. If it were otherwise, the entire structure of Rule 65-with its basic concept of issuing *binding* TROs and preliminary injunctions-would be sapped of strength entirely. *SEC v. Kimmes*, 753 F.Supp. 695, 700-701 (N.D.Ill.1990) (emphasis added) (citations omitted).

*See also People of State of Illinois ex rel. Hartigan v. Peters*, 871 F.2d 1336, 1340 (7th Cir.1989); *Gottfried v. Frankel*, 818 F.2d 485, 492-93 (6th Cir.1987); *Claus v. Smith*, 519 F.Supp. 829, 833-34 (N.D.Ind.1981); *SEC v. Capital Growth Co.*, 391 F.Supp. 593, 600 (S.D.N.Y.1974).

8. Indeed, Fed.R.Civ.P. 65(b) expressly provides that, under appropriate circumstances, temporary injunctive relief can be entered without *any* notice. Due Process permits this Court to act where there has been adequate notice and an opportunity to be heard, even in the absence of formal service. This is especially appropriate where, as here, a defendant has deliberately avoided service. *Cf. United States v. Lynd*, 301 F.2d 818, 823 (5th Cir.) ("[A] temporary injunction [is] issued to protect the rights of any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

person moving for it upon his making a showing that he is entitled to it. The grant of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case."), *cert. denied,* 371 U.S. 893 (1962).

9. Under Pennsylvania case law, a refusal to accept service of process, with knowledge of what the papers refused contain, may not defeat service of process nor prevent a case from proceeding to judgment. *Commonwealth ex rel. McKinney v. McKinney,* 476 Pa. 1, 381 A.2d 453, 455 (1977); *Pincus v. Mutual Assurance Company,* 457 Pa. 94, 321 A.2d 906, 910 (1974). *A fortiorari,* Development, Inc.'s refusal to accept service here, coupled with Eileen Amron's admitted receipt of the complaint and the evidence that the motion for preliminary injunction was delivered to the Amrons' home, do not defeat this Court's authority under Fed.R.Civ.P. 65 to preserve the status quo pending a plenary trial on the merits. *See* Document No. 5.

10. Although neither the Amrons individually nor any officer of Development, Inc. appeared in Court and authenticated the documents submitted by plaintiff, the Court finds them to be admissible on a number of grounds. Where evidence is proffered and not objected to, it is generally admitted under Fed.R.Evid. 103:

The basic policy of Rule 103 is that the rules of evidence are only to be enforced where enforcement is a matter of importance. It is left to the parties, in the first instance, to decide whether or not the rules are to be enforced.... It is only in rare cases that the trial judge will call for evidence the parties have not produced or exclude evidence they are content to see admitted. 21 C. Wright & K. Graham, *Federal Practice & Procedure: Evidence* § 5032, at 161 (1977).

***10** As all of plaintiff's proffered exhibits appear on their face to be relevant and authentic business records, and plaintiff has testified as to their reliability and trustworthiness, and no objection to their admissibility has been lodged, see findings of fact ¶ ¶ 4-6, I conclude that plaintiff's documents are admissible. *See* Fed.R.Evid. 103(a)(1); *see also* *New Market Investment Corp. v. Fireman's Fund Insurance Co.,* 774 F.Supp. 909, 917-18 (E.D.Pa.1991) (no post-trial review if timely objection to admission of evidence was not made); *Grace v. Mauser-Werke Gmbh,* 700 F.Supp. 1383, 1388 (E.D.Pa.1988).

This conclusion is buttressed by the fact that because this proceeding is preliminary in nature, evidentiary requirements are relaxed. For example, it is well-established that on a motion for preliminary injunction a court may receive and rely upon affidavits that do not meet the requirements of affidavits under Fed.R.Civ.P. 56(e), *i.e.,* they need not be made on personal knowledge or set forth facts that the affiant would be competent to testify to at trial. This is because:

[A] preliminary injunction only has the effect of maintaining the positions of the parties until the trial can be held; the order neither replaces the trial nor represents an adjudication of the merits. Furthermore, the urgency that necessitates a prompt determination of the preliminary injunction application may make it more difficult to obtain affidavits from people who are competent to testify at trial.... Finally, inasmuch as the grant of a preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had. 11A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2949, at 216-17 (2d ed.1995).

*See also* *Sierra Club, Lone Star Chapter v. FDIC,* 992 F.2d 545, 551 (5th Cir.1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). Accordingly, this Court concludes that plaintiff's exhibits 1 through 53 are admissible and are received into evidence for the purposes of the motion for preliminary injunction only. *See also* *Saks International, Inc. v. M/V "Export Champion",* 817 F.2d 1011, 1013-14 (2d Cir.1987) (principal precondition to admission of documents is that they have sufficient indicia of trustworthiness to be reliable even if they are records of nonparty and foundation is laid by witness not employed by entity that prepared them).

11. Rule 4(e) and (h) of the Federal Rules of Civil Procedure authorize a district court to exercise personal jurisdiction over foreign defendants to the same extent as that allowed under the so-called long-arm statute of the state in which the court sits.

***11** 12. "The Pennsylvania long-arm statute [, 42 Pa. Cons.Stat. Ann. § 5301, 5322 (West Supp.1995) ] contemplates that a court may exercise *in personam* jurisdiction on essentially two bases; this statutory framework tracks the two jurisdictional theories

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 8

defined by the Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945)." Strick Corp. v. A.J.F. Warehouse Distrib., Inc., 532 F.Supp. 951, 955 (E.D.Pa.1982).

13. A plaintiff may establish personal jurisdiction either by suing under a cause of action arising from minimum contacts of the defendant with the forum state (specific jurisdiction), 42 Pa. Cons.Stat. Ann. § 5322, or show that the defendant has "continuous and systematic" contacts with the forum state, in which case the cause of action need not arise from those contacts (general jurisdiction), 42 Pa. Cons.Stat. Ann. § 5301. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987). Further, under the Due Process Clause of the Fourteenth Amendment, the exercise of jurisdiction by a court may "not offend traditional notions of fair play and substantial justice." *Id.*

14. Plaintiff contends that this court has specific jurisdiction over Alan Amron Development, Inc. The specific jurisdiction statute of Pennsylvania, 42 Pa. Cons.Stat. Ann. § 5322(b), requires the defendant to have only the most minimum contacts with the Commonwealth and authorizes courts to exercise jurisdiction to the fullest extent allowed under the Constitution. *Strick Corp.,* 532 F.Supp. at 955.

15. In analyzing personal jurisdiction, the doctrine of "alter ego" is fully applicable, *i.e.,* a foreign corporation that would not on account of its own activities be subject to personal jurisdiction in the forum state may nonetheless be subjected to jurisdiction in the forum on the basis of activities of an alter ego under the same criteria that would justify disregarding the corporate fiction in other contexts. *Donatelli v. National Hockey League,* 893 F.2d 459, 465-66 (1st Cir.1990); *Third National Bank v. Wedge Group Incorporated,* 882 F.2d 1087, 1090 (6th Cir.1989), *cert. denied,* 493 U.S. 1058 (1990); *Savin Corp. v. Heritage Copy Products, Inc.,* 661 F.Supp. 463, 466-68 (M.D.Pa.1987); *Bielicki v. Empire Stevedoring Co.,* 741 F.Supp. 758, 761-63 (D.Minn.1990); *Botwinick v. Credit Exchange, Inc.,* 419 Pa. 65, 213 A.2d 349 (1965). The "essence of personal jurisdiction is to bring responsible parties before the court"; accordingly, "the artifice of separate legal incorporation" should be overridden where, in substance if not form, the foreign corporation is one and the same with the person or entity who availed itself of the privilege of transacting business in the forum state. *Donatelli,* 893 F.2d at 466.

16. Post-tort activity, when conducted to strip or furnish a corporation with assets in anticipation of impending legal liability, may be considered in making a determination whether to disregard the corporate entity. *See Minnesota Mining & Manufacturing Company v. Eco Chem, Inc.,* 757 F.2d 1256, 1264-65 (Fed.Cir.1985); *Lakota Girl Scout Council v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634, 637-38 (8th Cir.1975); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1350-51 (2d Cir.), *cert. denied,* 417 U.S. 932 (1974); *Select Creations, Inc. v. Paliafito America, Inc.,* 852 F.Supp. 740, 765-774 (E.D.Wis.1994). *Cf. Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1520 (3d Cir.1994) (alter ego of party to arbitration agreement would be subject to arbitral jurisdiction), *aff'd,* 115 S.Ct. 1920 (1995). "Were this not so, the owners of the property could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose initial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom." *Eco Chem,* 757 F.2d at 1263.

***12** 17. Although the alter ego doctrine is typically employed to pierce the corporate veil of a controlled entity to reach the assets of the controlling party (usually a shareholder or a parent corporation), the doctrine can also be applied in reverse to reach the assets of a controlled entity. *Massachusetts v. Bell Atlantic Tricon Leasing Corp. (In re Mass),* 178 Bankr.626 (M.D.Pa.1995) (Pennsylvania law); *In re Shailam,* 144 Bankr.626, 630 (Bankr.N.D.N.Y.1992) (New York law). "It is particularly appropriate to apply the alter ego doctrine in 'reverse' when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party." *Select Creations, Inc.,* 852 F.Supp. at 774. "Once an alter ego relationship is found, both the alter ego and the controlled entity will be subject to the jurisdiction of the Court, so long as one of the parties is subject to jurisdiction in its own right." *Id.*

18. Whether the corporate veil may be pierced is a question of state law. A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Company v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020 (1941). In Pennsylvania, choice of law analysis entails three steps. First, it must be determined whether the laws of the competing states actually differ. If not, no further analysis is necessary. *See Buckley v. McGraw-Hill, Inc.,* 782 F.Supp. 1042,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 9

1046 (W.D.Pa.1991), *aff'd*, 968 F.2d 12 (3d Cir.1992). If the laws do differ, it must then be determined whether there is a "false conflict," *i.e.*, whether "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdictions' law. In such a situation, the court must apply the law of the state whose interests would be harmed if its law is not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991). Finally, and only if both states have an actual policy interest that would be impaired by application of the other state's law, the competing interests are qualitatively weighed and the law of the state with the greater interest is applied. *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 231, 582 A.2d 27, 30 (1990).

19. Three states may have a significant interest in having their law applied to the question of whether Development, Inc. is the alter ego of Mr. Amron. Since it is the Pennsylvania "long-arm" statute that is being applied, Pennsylvania may have a significant interest in having its law applied to the alter ego question in this context. Florida and New York, the states of Development, Inc.'s incorporation and principal place of business, respectively, may have a significant interest in application of their law to one of their corporate citizens. *See Select Creations, Inc.*, 852 F.Supp. at 774 (law of state of incorporation applies to determine whether corporate form should be disregarded). It is not necessary, however, to choose among these candidates, because upon examination their alter ego rules-though formulated in a variety of ways-all ultimately rely upon the same case-by-case analysis of very similar criteria.

***13** 20. In Pennsylvania, the alter ego concept is a tool of equity that is appropriately exercised when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy. *Kaplan*, 19 F.3d at 1521. It will be used to hold a corporation liable for debts of its principals where they have formed or used the corporation to hide assets and thus avoid pre-existing personal liability. 1 *Fletcher Cyclopedia Corporations* § 41.70 at 707 (1990).

21. A series of factors may be considered in determining whether to disregard corporate form in Pennsylvania. No one factor is controlling. These factors include: failure to observe corporate formalities, intermingling of corporate and personal affairs, insolvency of the debtor, and whether "a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud or creditors." *Kaplan*, 19 F.3d at 1521; *Solomon v. Klein*, 770 F.2d 352, 353-54 (3d Cir.1985); *American Bell, Inc. v. Federation of Telephone Workers*, 736 F.2d 879 (3d Cir.1984); *United States v. Pisani*, 646 F.2d 83 (3d Cir.1981).

22. Under Florida alter ego principles, in order to pierce the corporate veil there must be showings that the corporation to be pierced is a "mere instrumentality" of the controlling party and that there has been "improper conduct." *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1117 (Fla.1984). Other cases explicating this standard make it clear that the elements of Florida's alter ego law are substantially the same as that of Pennsylvania.

23. Factors to be considered under Florida law in determining whether to pierce the corporate veil include whether corporate formalities have been observed, whether there was domination by virtue of ownership or congruency of goals, whether there had been commingling of assets or use of corporate assets for personal obligations, and whether the corporation was a vehicle for its shareholders' personal business interest. *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.*, 500 F.Supp. 491, 502 (S.D.Fla.1980); *Commonweal, Inc. v. IRS (In re Commonweal, Inc.)*, 171 Bankr.405, 410 (Bankr.M.D.Fla.1994).

24. One Florida appellate court has adopted the following as a "workable formula" for applying the standard of "improper conduct":

[C]ourts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose ... or where the purpose is to evade some statute or accomplish some fraud or illegal purpose or where the corporation was employed by the stockholders for fraudulent or misleading purposes, was organized or used to mislead creditors or to perpetuate a fraud upon them or to evade existing personal liability.

*Steinhardt v. Banks*, 511 So.2d 336, 339 (Fla.Dist.Ct.App.1987). Moreover, "fraud will be presumed when there is self dealing or when the legal effect of a transaction is to delay or hinder creditors." *Hillsborough Holdings Corp. v. Celotex Corp.*, 150 Bankr.817, 820 (Bankr.M.D.Fla.1993).

***14** 25. Especially pertinent under Florida law is the recent case of *Walton v. Tomax Corporation*, 632

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 10

So.2d 178 (Fla.Dist.Ct.App.1994). Walton sought to pierce the corporate veil of Tomax to hold its president, McGuire, personally liable on a contract claim. Tomax was wholly owned by McGuire's wife. Among the allegations that the appellate court found created an issue of fact on the alter ego issue were: that Tomax used McGuire's personal credit card to pay bills; that Tomax made unexplained payments to McGuire family members; McGuire himself received unexplained small payments in excess of his salary; that Tomax made large contributions to charities that one of McGuire's sons was affiliated with; and that McGuire received some corporate receipts directly. The court held that a jury could conclude that corporate assets had been depleted for the personal benefit of McGuire and his family, and therefore that McGuire could be the alter ego of Tomax. The facts of *Tomax* are similar to those in the instant case.

26. Under New York law, a court will pierce the corporate veil or disregard the corporate form whenever necessary to prevent fraud or achieve equity. *Hyland Meat Co. v. Tsagarakis,* 202 A.D.2d 552, 609 N.Y.S.2d 625, 626 (1994). "The concept is equitable in nature, and the decision whether to pierce the corporate veil in a given instance will depend on the facts and circumstances." *Id.* The issue is whether "the policy behind the presumption of corporate independence and limited shareholder liability-encouragement of business development-is outweighed by the policy justifying disregarding the corporate form-the need to protect those who deal with the corporation." *Wm. Passalacqua Builders v. Resnick Developers South, Inc.,* 933 F.2d 131, 139 (2d Cir.1991).

27. Under New York alter ego law, when a corporation is being operated by an individual in such a manner as to render the corporate form a fiction and to commit fraud or a wrong, the courts will pierce the corporate veil so as to hold the individual officer or shareholder responsible for obligations of the corporation. *Canario v. Lidelco, Inc.,* 782 F.Supp. 749, 759 (E.D.N.Y.1992). The factors to be considered under New York law in determining whether a corporation is merely a shell being used by an individual include:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence ... (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. *Resnick Developers South, Inc.,* 933 F.2d at 139.

***15** 28. The corporate veil may not be pierced absent a showing of fraud or disregard of the corporate form, *e.g.,* through the intermingling of corporate and personal funds. *Bank Saderat Iran v. Amin Beydoun, Inc.,* 555 F.Supp. 770, 772 (S.D.N.Y.1983).

29. The Court concludes that, whether the law of Pennsylvania, New York or Florida is applied, Development, Inc. is the alter ego of Mr. Amron. The factors that the Court finds especially pertinent are: (1) Mr. Amron's admitted "dire financial straits" at the time he incorporated Development, Inc., see finding of fact ¶ 20; (2) Development, Inc. essentially carries on the business of Talk To Me Programs and TTMP, see findings of fact ¶ ¶ 25-28; (3) Mr. Amron agreed to assign his existing and future intellectual property rights to Development, Inc. without specifying the compensation he would receive, see findings of fact ¶ ¶ 25-31; (4) Mr. Amron lent his individual name to the corporation and became its president and one of its two directors, see findings of fact ¶ ¶ 26, 27; (5) the other director and sole shareholder is his spouse, Eileen Amron, see finding of fact ¶ 26; (6) Mr. Amron now performs for Development, Inc. the jobs he previously performed on his own behalf, see finding of fact ¶ 27; (7) Mr. Amron has used personal funds to cover corporate bills of Development, Inc., see finding of fact ¶ 37; (8) Development, Inc.'s funds are thoroughly commingled with the personal funds of Mr. Amron and his family and are used to pay family expenses of Mr. Amron, see findings of fact ¶ ¶ 35, 36; (9) corporate funds have been used to pay Mr. Amron's personal expenses, including expenses relating to his defense of the Underlying Action, see finding of fact ¶ 36; (10) despite his small salary, Development, Inc.'s revenues appear to derive mostly from Mr. Amron's creative efforts and contacts, see finding of fact ¶ 34; (11) Mr. Amron and Development, Inc. have been less than candid in sworn statements regarding Mr. Amron's personal role in certain of Development, Inc.'s products, which suggests an intent to mislead creditors, see finding of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 11

fact ¶ 33; (12) much of Development, Inc.'s financing appears to come from a company, RASCO Temperature Alarms, Inc. nominally owned by Mr. Amron's father of which Mr. Amron is an employee, see finding of fact ¶ 29; and (13) Mr. Amron, Development, Inc. and RASCO Temperature Alarms, Inc. all appear to operate out of the same address and use the same post office box (as did Talk To Me Programs and RASCO Refrigeration Alarms Corp. before them), see finding of fact ¶ 28. While no one of these factors alone compel the conclusion that Mr. Amron and Development, Inc. are alter egos, together they create a picture of disregard and abuse of the corporate form. Accordingly, this Court concludes that plaintiff has satisfied its burden to demonstrate that it is likely that it could prove at trial that Alan Amron and Development, Inc. are alter egos of each other.

***16** 30. This Court had jurisdiction to enter the underlying judgment against Mr. Amron. *Larami Corp. v. Amron,* No. 91-6145 (E.D.Pa. June 11, 1992). A court's jurisdiction over a person or entity extends to post-judgment proceedings to collect or enforce a duly-entered, valid judgment of the court. Because this Court concluded above that Development, Inc. is the alter ego of Mr. Amron, see conclusion of law ¶ 29, this Court has specific personal jurisdiction over Development, Inc. in this case where Mr. Amron attempted to thwart the collection and enforcement of this Court's eventual underlying judgment using Development, Inc. as an instrumentality.

31. The determination of whether an exercise of personal jurisdiction is fair and reasonable depends upon the burden that would be imposed upon the defendant in light of such other factors as the forum state's interest in resolving the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in the most efficient resolution of the controversy and the interest of the several states in furthering substantive social policies. *Kingsley & Keith (Canada), Ltd. v. Mercer International Corp.,* 291 Pa.Super. 96, 109, 435 A.2d 585, 591 (1981), *aff'd,* 500 Pa. 371, 456 A.2d 1333 (1983), *cert. denied,* 464 U.S. 982 (1983).

32. The burden placed upon Development, Inc. is not sufficiently heavy to counterbalance the factors favoring the exercise of jurisdiction. Indeed, because the principals of Development, Inc. now appear to reside primarily in New York, Pennsylvania may be a substantially less burdensome forum than the corporation's home state of Florida. Moreover, the factors favoring resolution in this forum are particularly compelling. Pennsylvania, like any state, has a strong interest in the enforceability of its judgments and in preventing defendants and judgment debtors from fraudulently disposing of assets. Plaintiff's interest in obtaining convenient and effective relief is also implicated; plaintiff should not have to travel through multiple jurisdictions and through multiple corporate shells to obtain meaningful relief. Judicial efficiency will also be served by having matters ancillary to an underlying judgment (and involving in substance the same parties) adjudicated in the same jurisdiction.

33. "A district court possesses inherent powers of equity sufficient to enable it to preserve the status quo until the question of its jurisdiction can be resolved." *Fernandez-Roque v. Smith,* 671 F.2d 426, 431 (11th Cir.1982). "[P]ending a decision on the question of jurisdiction, a District Court has the power to issue a temporary restraining order in order to preserve existing conditions." *Stewart v. Dunn,* 363 F.2d 591, 598 (5th Cir.1966). Thus, it is not necessary for this Court to make a final determination on the issue of personal jurisdiction as a predicate to issuing preliminary injunctive relief, it is sufficient that plaintiff has shown a reasonable probability that it will ultimately prevail on this issue. *Weitzman v. Stein,* 897 F.2d 653, 659 (2d Cir.1990) (party seeking preliminary injunction required to establish reasonable probability of ultimate success on question of personal jurisdiction). This Court concludes, based on the foregoing, that plaintiff has demonstrated a reasonable probability of ultimate success on the question of personal jurisdiction. This Court has thoroughly reviewed the record and concludes that defendant Development, Inc., through Alan Amron, is subject to the personal jurisdiction of this Court. *See* conclusions of law ¶¶ 29-32.

***17** 34. In considering a motion for preliminary injunction under Fed.R.Civ.P. 65, a court must carefully weigh four factors:
(1) whether the moving party has shown a reasonable probability of success on the merits;
(2) whether the moving party will be irreparably injured by the denial of preliminary relief;
(3) whether granting preliminary relief will result in even greater harm to the other party enjoined; and
(4) whether granting preliminary relief will be in the public interest.

*See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985). In this case, all four factors militate in favor of injunctive relief.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 12

35. Plaintiff's complaint seeks avoidance, as fraudulent conveyances, of all transfers to defendants by or on behalf of Mr. Amron and TTMP. Thus, the Court must again turn to state law, in this case the law of fraudulent conveyances, to determine whether plaintiff has met its burden of showing a reasonable probability of success on the merits of its claim.

36. Again, it is unnecessary to choose between the law of Pennsylvania, Florida or New York. Pennsylvania and Florida have adopted substantially identical versions of the Uniform Fraudulent Transfers Act. New York continues to enforce the earlier Uniform Fraudulent Conveyances Act with some unique provisions. Nonetheless, the result under New York law, as will be discussed, is the same as under the Uniform Fraudulent Transfer Act.

37. Under Pennsylvania and Florida law, a transfer is fraudulent if the transfer was made with either the actual intent to "hinder, delay or defraud" a creditor or if the debtor makes the transfer without receiving reasonably equivalent value in exchange for the transfer at a time when the debtor "intended to incur, or believed or reasonably should have believed" that the debtor would incur debts the debtor was incapable of paying when due. 12 Pa. Cons.Stat. Ann. § 5104; Fla.Stat.Ann. § 726.105. Thus, under Pennsylvania and Florida law, the conveyances to Development, Inc. are avoidable if either made with actual intent to defraud, *or* were not for reasonably equivalent value and made at a time when Mr. Amron and TTMP should have known they would be unable to pay. Plaintiff has shown a reasonable probability of success under either test.

38. The Uniform Act provides that, in determining whether there is an actual intent to defraud, consideration may be given to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made ... the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred ...;
***18** (9) the debtor was insolvent or became insolvent shortly after the transfer was made ...;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. Cons.Stat. Ann. § 5104(b); Fla.Stat.Ann. § 726.105(b). These considerations are, in essence, objective circumstances or other indicia of fraud from which actual fraudulent intent can be inferred.

39. Based upon the foregoing, and specifically, findings of fact ¶ ¶ 42 and 43, I conclude that plaintiff has demonstrated that there is a reasonable probability that plaintiff will be able to show that Mr. Amron transferred property to Development, Inc. with actual intent to defraud or hinder creditors. This conclusion is based upon the finding that plaintiff will be able to prove that many of the considerations above existed, and that defendant Development, Inc. intended to defraud plaintiff. The Court finds evidence that at least seven of the 11 considerations enumerated in the Uniform Act are present here, in favor of plaintiff, including numbers (1), (2), (4), (5), (8), (9), (10) above. *See id.;* findings of fact generally.

40. Based upon finding of fact ¶ 44, I conclude that plaintiff has also shown a reasonable probability of meeting the second test under the Uniform Act, *i.e.,* that the transfers were made without receiving reasonably equivalent value in exchange at a time when the debtor "intended to incur, or believed or reasonably should have believed" that the debtor would incur debts the debtor was incapable of paying when due.

41. New York law also provides that "every conveyance made ... with actual intent ... to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. C.L.S.D.R. & C.R. § 276. New York law goes even further, however, and provides that a conveyance made by a defendant in a civil action without fair consideration is fraudulent without regard to the actual intent of the defendant if the defendant ultimately fails to satisfy the judgment. N.Y. C.L.S.D.R. & C.R. § 273-A. Under New York law, plaintiff need only show that the conveyances to Development, Inc. occurred while Amron and TTMP were defendants in plaintiff's suit, that judgment was entered and that it has not been satisfied. The burden then falls on Development, Inc. to show reasonably equivalent consideration. *Republic*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 13

*Insurance Co. v. Levy,* 69 Misc.2d 450, 329 N.Y.S.2d 918, 920 (N.Y.Sup.Ct.1972). Based upon findings of fact ¶ ¶ 7, 21, 23-34, and because defendant has not appeared to demonstrate that it provided reasonably equivalent consideration for the transfers from Alan Amron, I conclude that plaintiff has shown a reasonable probability that it will prevail under the New York legal standard.

42. The Pennsylvania, Florida and New York statutes give plaintiff a right to avoid the transfer by Alan Amron to Development, Inc. to the extent necessary to satisfy plaintiff's claim. 12 Pa. Cons.Stat. Ann. § 5107(a)(1); Fla.Stat.Ann. § 726.108; N.Y. C.L.S.D.R. & C.R. § 278(1)(a).

***19** 43. Based upon findings of fact ¶ ¶ 45 and 46, the second required element for preliminary injunctive relief, *i.e.,* that the movant will suffer irreparable harm if the injunction does not issue, is also satisfied.

44. Indeed, the Pennsylvania and Florida Uniform Fraudulent Transfer Act expressly recognize the appropriateness of injunctive relief to prevent further dissipation and transfers of fraudulently conveyed property. *See* 12 Pa. Cons.Stat. Ann. § 5107(a)(3)(i) (West Supp.1995); Fla.Stat.Ann. § 726.108.

45. In *Temtex Products, Inc. v. Kramer,* 330 Pa.Super. 183, 479 A.2d 500, 507 (1984), the Pennsylvania superior court also recognized that fraudulent transfers are appropriate to invoke preliminary injunctive relief. In *Temtex Products, Inc.,* the Superior Court reversed a lower court's refusal to issue a preliminary injunction and, directed that an injunction issue to prevent defendants from further dissipation of the property transferred. The plaintiff in *Temtex* alleged that the defendants had engaged in a scheme to avoid Temtex's judgment by transferring certain real property and mortgage interests for less than fair and reasonable consideration. The Court held that these allegations were sufficient grounds for issuance of a preliminary injunction because the judgment creditor's assets were being dissipated. 479 A.2d at 507. The superior court concluded by noting that "we could conceive of few cases in which the grant of a preliminary injunction would be more appropriate." 479 A.2d at 508.

46. The instant case is no less compelling than *Temtex Products, Inc.* Like the judgment debtor in *Temtex Products, Inc.,* the plaintiff has demonstrated that Mr. Amron and TTMP have transferred property of value without receiving any apparent consideration. *See* findings of fact ¶ ¶ 30, 31. The transfers apparently left Mr. Amron and TTMP with no assets with which to satisfy plaintiff's judgment. *See* findings of fact ¶ ¶ 13-16. Those transfers were accomplished at the very time that Mr. Amron was a defendant in an action which he knew could result in very substantial damages being imposed against him and was admittedly near bankruptcy. The transfers were made to a corporation which likely was created and/or used for that purpose, nominally owned by Amron's wife and which continued Mr. Amron's then-existing business. *See* finding of fact ¶ 25. Simply stated, the Court concludes that Mr. Amron likely engaged in a transparent fraud to defeat his creditors. Injunctive relief is warranted to prevent Development, Inc. from further transferring or otherwise dissipating the property given to them by Amron and TTMP during the pendency of this proceeding. *See* findings of fact ¶ ¶ 45, 46.

47. Plaintiff would be more seriously injured if an injunction does not issue than Development, Inc. will be injured if an injunction does issue. *See* findings of fact ¶ ¶ 45, 47. Accordingly, based upon findings of fact ¶ ¶ 45 and 47, I conclude that the balance of the equities here clearly favors granting the injunction.

***20** 48. Similarly, the public interest also favors granting an injunction. The party seeking the injunction has been awarded a $10 million judgment by a United States District Court. Its attempts to collect that judgment have been frustrated by the fraud of Mr. Amron and TTMP and their disregard for various state corporate forms. The public interest will be furthered if judgment debtors are prohibited from frustrating the legal process, and judgment creditors are protected from having to expend endless resources to collect on their judgments. In these circumstances, I conclude that an injunction is in the public interest.

An appropriate Order follows.

FN1. At the hearing, plaintiff indicated that it was only pursuing an injunction against Development, Inc. at this time.

FN2. Following entry of judgment in the underlying case of *Larami Corp. v. Amron & Talk To Me Products, Inc.* (E.D.Pa. No. 91-3145) (the "Underlying Case"), plaintiff changed its name from Larami Corporation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 14

to Larami Investment Company and, finally, to Star Creations Investment Company, Ltd. (P-51 & 52).

FN3. While the Underlying Case is presently on appeal, no stay has been obtained or requested pursuant to Fed.R.Civ.P. 62(d).

FN4. RASCO Temperature Alarms, Inc.'s balance sheet for year-end 1993 shows no paid-in capital or shareholder loans. (P-41 at 10). The only salary or wages paid by RASCO Temperature Alarms, Inc. during that first year of operation was $25,000 paid to Mr. Amron. (P-41 at 9; P-5 at 4).

FN5. Development, Inc.'s balance sheets for 1993 reflect no paid-in capital beyond the par value of the common stock. (P-2, 3, 4 & 6). As of the end of 1993, the balance sheet showed a shareholder loan of less than $6,000.

FN6. Mrs. Amron was the only other director. (P-1).

FN7. Indeed, the record indicates that Mr. Amron has other sources of income and that there are other Amron family resources.

FN8. The motion was also filed on behalf of the individual defendant, Eileen Amron pro se. However, because plaintiff has chosen to proceed against the corporate defendant only with respect to the motion for preliminary injunction, Mrs. Amron's motion to dismiss will be considered in the normal course, but not herein.

FN9. Although no attorney has appeared for Development, Inc., it is evident that the Motion to Dismiss and the correspondence addressed to the Court on its behalf has been prepared in consultation with someone with legal training. Indeed, although the Motion to Dismiss is not signed by an attorney, the Certificate of Service accompanying it is signed by an attorney associated with TTMP in the Underlying Case, Paul Eisenstein. (P-47 at 2, n. 3).

E.D.Pa. 1995
Star Creations Inv. Co., Ltd. v. Alan Amron Development, Inc.
Not Reported in F.Supp., 1995 WL 495126 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:95cv04328 (Docket) (Jul. 12, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**



**C**
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
HASBRO, INC. and Larami Limited, Petitioners
v.
**Alan AMRON** and **Amron** Development, Inc., Respondents
**No. CIV.A.02 MC 00231.**

Feb. 21, 2006.

**Background:** Petition was filed to confirm arbitration award in favor of petitioners, which determined that patent was unenforceable against them and that patentees were liable on fraud-based counterclaims. Patentees filed motion to vacate the arbitration award.

**Holdings:** The District Court, Gardner, J., held that:

2(1) by voluntarily withdrawing federal patent infringement action after panel commenced the arbitration, patentees waived any contest to arbitration panel's jurisdiction to determine counterclaims, and such counterclaims were arbitrable because they were part of the dispute over the enforceability of the patent;

4(2) under New York's borrowing statute, Delaware statute of limitations applied to Delaware resident's counterclaim against New York patentee for fraudulent conveyance;

8(3) arbitrators' failure to apply correct statute of limitations to fraudulent conveyance counterclaim constituted a manifest disregard of the law; and

12(4) arbitrators did not commit a manifest disregard of the law in determining that patentees came to the arbitration with unclean hands.

Motions granted in part and denied in part.

West Headnotes

**[1] Alternative Dispute Resolution 25T 329**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk327 Mistake or Error
25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases
(Formerly 33k63.1 Arbitration)
Arbitration awards can be vacated if they are in manifest disregard of the law.

**[2] Alternative Dispute Resolution 25T 182(2)**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk177 Right to Enforcement and Defenses in General
25Tk182 Waiver or Estoppel
25Tk182(2) k. Suing or Participating in Suit. Most Cited Cases
(Formerly 33k23.3(2) Arbitration)

**Alternative Dispute Resolution 25T 200**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk197 Matters to Be Determined by Court
25Tk200 k. Arbitrability of Dispute. Most Cited Cases
(Formerly 33k23.14 Arbitration)
By voluntarily withdrawing federal patent infringement action after panel commenced the arbitration, patentees waived any contest to arbitration panel's jurisdiction to determine counterclaims asserted against patentees based on allegations of fraudulent conduct; furthermore, such counterclaims were arbitrable because they were part of the dispute over the enforceability of the patent.

**[3] Alternative Dispute Resolution 25T 334**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk331 Fraud, Partiality, or Misconduct
25Tk334 k. Arbitrators' Fraud or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Misconduct in General. Most Cited Cases
(Formerly 33k64.2 Arbitration)
Arbitrators did not engage in misconduct by failing to stay arbitration hearing on fraud-based counterclaims brought against patentee until federal court ruled on patentees action seeking declaratory judgment that he had not committed fraud; patentee did not attempt to articulate how his rights were so affected as to deprive him of a fair hearing. 9 U.S.C.A. § 10(a)(3).

**[4] Limitation of Actions 241 ⚿2(1)**

241 Limitation of Actions
241I Statutes of Limitation
241I(A) Nature, Validity, and Construction in General
241k2 What Law Governs
241k2(1) k. In General. Most Cited Cases
Under New York's borrowing statute, Delaware statute of limitations applied to Delaware resident's counterclaim against New York patentee for fraudulent conveyance arising from same transactions and occurrences giving rise to patentee's infringement claims where New York had no statute of limitations on counterclaims of type raised and Delaware had a defined statute of limitations. N.Y.McKinney's CPLR 202; 6 Del.C. § 1309.

**[5] Limitation of Actions 241 ⚿99(2)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k98 Fraud as Ground for Relief
241k99 In General
241k99(2) k. Fraud in Obtaining Possession of or Title to Property. Most Cited Cases

**Limitation of Actions 241 ⚿100(3)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k98 Fraud as Ground for Relief
241k100 Discovery of Fraud
241k100(3) k. Fraud in Obtaining Possession of or Title to Property. Most Cited Cases
Under Delaware law, a cause of action with respect to a fraudulent transfer or conveyance is extinguished unless an action is brought within four years after the transfer is made or, if later, within one year after the transfer is or could reasonably have been discovered; furthermore, concealment of a fraudulent conveyance, not reasonably discoverable, tolls operation of the statute. 6 Del.C. § 1309.

**[6] Limitation of Actions 241 ⚿41**

241 Limitation of Actions
241I Statutes of Limitation
241I(B) Limitations Applicable to Particular Actions
241k41 k. Set-Offs, Counterclaims, and Cross-Actions. Most Cited Cases
Under Delaware law, a counterclaim is an action for statute of limitations purposes.

**[7] Alternative Dispute Resolution 25T ⚿329**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk327 Mistake or Error
25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases
(Formerly 33k63.1 Arbitration)
A manifest disregard for the law warranting vacatur of arbitration award contemplates more than an error of fact or law; rather, it is reserved for situations where an arbitrator recognizes a clearly governing legal principle and then proceeds to ignore it.

**[8] Alternative Dispute Resolution 25T ⚿329**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk327 Mistake or Error
25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases
(Formerly 33k63.1 Arbitration)
Arbitrators' failure to apply correct statute of limitations to fraudulent conveyance counterclaim asserted against patentee rose beyond a simple error of law to a manifest disregard of the law warranting vacatur of arbitration award on counterclaim because, under correct statute, counterclaim was barred by the statute of limitations. N.Y.McKinney's CPLR 202.

**[9] Alternative Dispute Resolution 25T ⚿329**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk327 Mistake or Error

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases
(Formerly 33k63.1 Arbitration)
It was not a manifest disregard of the law for the arbitrators to conclude that patentee breached provision of prior settlement agreement, which required that patentee and any companies controlled by patentee would not commence any litigation against petitioners but would agree to bring any claim against any of them to binding arbitration, by seeking declaratory judgment from the federal courts that he had not committed fraud against petitioners and that petitioners should be collaterally estopped from raising certain issues in the future.

**[10] Equity 150 ⚷65(1)**

150 Equity
150I Jurisdiction, Principles, and Maxims
150I(C) Principles and Maxims of Equity
150k65 He Who Comes Into Equity Must Come with Clean Hands
150k65(1) k. In General. Most Cited Cases
Unclean hands is a recognized equitable defense to an action for patent infringement.

**[11] Equity 150 ⚷65(2)**

150 Equity
150I Jurisdiction, Principles, and Maxims
150I(C) Principles and Maxims of Equity
150k65 He Who Comes Into Equity Must Come with Clean Hands
150k65(2) k. Nature of Unconscionable Conduct. Most Cited Cases
To prove the defense of unclean hands in action for patent infringement, party must show that opposing party conducted himself in such a manner so as to shock the moral sensibilities of the trier of fact.

**[12] Alternative Dispute Resolution 25T ⚷329**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk327 Mistake or Error
25Tk329 k. Error of Judgment or Mistake of Law. Most Cited Cases
(Formerly 33k63.1 Arbitration)
Arbitrators did not commit a manifest disregard of the law in determining that patentees came to the arbitration with unclean hands by failing to disclose the existence of the patent application for parent of patent which was subject to infringement suit and the existence of newly created corporation during the pendency of patentee's bankruptcy proceedings and the settlement negotiations to resolve the pending bankruptcy proceedings and a number of other pending lawsuits and disputes.

**[13] Alternative Dispute Resolution 25T ⚷316**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(G) Award
25Tk316 k. Actions Exceeding Arbitrator's Authority. Most Cited Cases
(Formerly 33k57.1 Arbitration)
Arbitrators, who found patentee guilty of unclean hands, did not exceed their authority by declaring patent unenforceable against parties accused of patent infringement, but not against the entire world.

**Patents 291 ⚷328(2)**

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases
5,915,771, 6,234,347. Cited.

***679** Gary Allen Rosen, for Petitioners.
Arthur M. Dresner, for Respondents.

*MEMORANDUM*

GARDNER, District Judge.
This matter is before the court on the Petition to Confirm Arbitration Award ***680** filed on behalf of petitioners Hasbro, Inc., and Larami Limited on September 12, 2002 and the Motion to Vacate the Arbitration Award filed on behalf of respondents Alan Amron and Amron Development, Inc., September 30, 2002.[FN1] By Order dated February 25, 2004 and filed February 27, 2004 we permitted additional briefing by the parties.[FN2] After oral argument, and for the reasons expressed below, we grant in part and deny in part the petition to confirm the arbitration award. Furthermore, we grant respondents' motion to vacate the arbitration award in part and deny it in part.

FN1. On September 30, 2002 respondents filed a document entitled Respondents'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Opposition to Petition to Confirm Arbitration Award and Enter Judgment Thereon and Respondents' Motion to Vacate Arbitration Award. This document serves as respondents' answer to the Petition to Confirm Arbitration Award and as respondents' motion to vacate the arbitration award in this matter. Petitioners' Answer to Respondents' Motion to Vacate Arbitration Award was filed October 11, 2002. Respondents' Reply Brief in Support of Their Opposition to Petition to Confirm Arbitration Award and Their Motion to Vacate the Award was filed October 23, 2002.

FN2. By the February 25, 2004 Order of the undersigned we granted Respondents' Motion for Leave to File Supplemental Memorandum of Law in Opposition to Petition to Confirm Arbitration Award and in Support of Cross-Motion to Vacate Arbitration Award. Respondents' Supplemental Memorandum of Law in Opposition to Petition to Confirm Arbitration Award and in Support of Cross-Motion to Vacate Arbitration Award was filed February 24, 2004. Petitioners' Supplemental Memorandum Pursuant to Order of February 25, 2004 was filed March 2, 2004.

Specifically, we confirm the arbitration award in all respects except the award regarding the counterclaim for fraudulent conveyance. We vacate the arbitrators' decision regarding the counterclaim of fraudulent conveyance because we conclude that that cause of action is barred by the statute of limitations.

*JURISDICTION AND VENUE*

Jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391 because the parties submitted to jurisdiction by the American Arbitration Association ("AAA") and where the subject arbitration took place in this judicial district in Philadelphia, Pennsylvania.

*PROCEDURAL HISTORY AND FACTS*

Initially, we note that this matter has a long and tortured history of litigation and animosity between the parties and their predecessors. For clarity of the decision, we have attempted to provide a condensed version of the procedural history.

Because of the nature of this matter, the procedural and factual history of this case are somewhat intertwined. Therefore, based upon the pleadings, exhibits, arbitration record and briefs of the parties, we outline the following relevant procedural history and pertinent facts.

Petitioner Hasbro, Inc. is a corporation organized under the laws of Rhode Island, with its principal place of business in Pawtucket, Rhode Island. Petitioner Larami Limited is a corporation organized under the laws of Delaware, with its principal place of business in Pawtucket, Rhode Island.

Respondent Alan Amron is an individual residing in Syosset, New York. Respondent Amron Development, Inc. is a corporation organized under the laws of New York with its principal place of business in Syosset, New York.

On June 24, 1994 Larami Corporation, predecessor-in-interest of petitioners, obtained a jury verdict against defendants ***681** Talk to Me Products, Inc. and Alan Amron for ten million dollars in a trial conducted by our colleague, then United States District Judge, now Senior District Judge, Lowell A. Reed, Jr. The jury found that defendants had violated Section 43(a) of the Lanham Act [FN3], tortiously defamed and commercially disparaged Larami, as well as tortiously interfered with Larami's contractual relations. Judgment was entered after the trial.

FN3. 15 U.S.C. § § 1051 through 1127.

After entry of the $10,000,000 judgment, Larami Corporation conducted discovery in aid of execution. In response to that discovery, Mr. Amron disclosed that he and his wife, Eileen Amron, had formed a Florida corporation called Alan Amron Development, Inc. Larami Corporation believed that Alan Amron Development, Inc. was an alter ego of Mr. Amron and was being used for the purpose of shielding his assets from creditors. Larami Corporation, by its successor-in-interest Star Creations Investment Company, brought suit against Alan Amron Development, Inc. seeking to void as, fraudulent conveyances, certain transactions between Mr. Amron and Alan Amron Development, Inc.

On August 18, 1995, Judge Reed granted Star

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Creations a preliminary injunction against Alan Amron Development, Inc. The injunction prevented Alan Amron Development, Inc. from disposing of its property in an effort to avoid having sufficient assets to satisfy the judgment against Mr. Amron.

On August 30, 1995 Alan Amron Development, Inc. and Alan Amron, individually, filed for Chapter 11 bankruptcy protection. Star Creations subsequently filed a motion in the United States Bankruptcy Court for the Eastern District of New York seeking to have its judgment declared non-dischargeable. Star Creations' motion was subsequently granted. However, the Bankruptcy Court denied Star Creations' alternate motions for appointment of an operating trustee or conversion of the Alan Amron Development, Inc. and Alan Amron Chapter 11 bankruptcy cases to Chapter 7 cases.

In September 1997, the parties entered into a Settlement Agreement which resolved the pending bankruptcy proceedings and a number of other pending lawsuits and disputes, as well.

Paragraph 41(a) of the Settlement Agreement provides that for a period of 10 years, Alan Amron and any companies controlled by him will not commence any litigation against the petitioners in this case, but will agree to submit such claims to binding arbitration before the American Arbitration Association in Philadelphia, Pennsylvania.

Moreover, paragraph 19 of the Settlement Agreement provides that "[e]ach of the Parties consents and submits to the jurisdiction of the American Arbitration Association in Philadelphia, PA with respect to resolution of those disputes which arise under paragraph 14 herein, as well as disputes with respect to interpretation of this agreement."

In July 1995 the Amrons formed a New York corporation named Amron Development, Inc. The existence of this corporation was not disclosed to petitioners until sometime in 1999 and was never disclosed to the bankruptcy court. One of the assets transferred to Amron Development, Inc. was a patent application which forms the underlying basis of the current dispute.

In August 1999 Amron Development, Inc. filed a demand for arbitration relating to ***682**United States Patent No. 5,915,771 ("771 patent"). After hearing, the arbitration panel ruled in favor of Hasbro and Larami and against Amron Development, Inc. Thereafter, in February 2000 Amron Development, Inc. filed amended claims on the 771 patent which led to the issuance of a second patent, United States Patent No. 6,234,347 ("347 patent").

On November 27, 2001 Alan Amron, filed a pro se Complaint in the United States District Court for the Eastern District of New York in case number 01-CV-7830 seeking various types of declaratory judgment relief. Specifically, Mr. Amron sought: (1) an Order precluding petitioners from asserting any claims in the future for events that occurred prior to the 1997 Settlement Agreement; (2) a ruling that any allegations of fraud made by petitioners against Mr. Amron or the Amron corporations were without merit; (3) a determination that petitioners have no claim for unclean hands based upon any conduct occurring prior to the Settlement Agreement; and (4) an Order estopping petitioners from raising any fraud claims based upon the settlement negotiations.[FN4]

FN4. See the prayer for relief contained in the Complaint filed in the United States District Court for the Eastern District of New York attached as Exhibit F to the Appendix of Exhibits to Respondents' Supplemental Memorandum of Law in Opposition to Petition to Confirm Arbitration Award and in Support of Cross-Motion to Vacate Arbitration Award, which Appendix was filed February 21, 2004.

In the Jurisdiction and Venue portion of his Complaint, Mr. Amron asserts that his lawsuit was related to the validity of the agreement to arbitrate. Throughout the Complaint he alleges the invalidity of petitioners' defense of unclean hands and avers how this defense has been allegedly utilized by petitioners in the past.

On November 29, 2001 Amron Development, Inc. filed a Demand for Arbitration, claiming that petitioners were infringing on a patent issued to Amron Development, Inc. for a "pressurized toy water gun with selective pressurization" based upon the 347 patent. The Demand for Arbitration requested the arbitrators to stop the infringement and to award Amron Development back royalties.

On December 19, 2001 petitioners filed a pleading styled Counterclaim/Additional Claim to Amron's Demand for Arbitration. The pleading alleged counterclaims for fraudulent conveyances, common law fraud, civil conspiracy to commit fraud, breach of contract and breach of the duty of good faith and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fair dealing. Furthermore, petitioners sought avoidance of the fraudulent conveyances, reformation of the August 19, 1997 Settlement Agreement, compensatory damages, punitive damages and legal fees and costs. Finally, petitioners raised the defense of unclean hands to the allegation of willful patent infringement.

Prior to commencement of the arbitration, Mr. Amron requested the arbitrators to stay commencement of the arbitration until the District Court in New York ruled on the pending Complaint. The arbitrators declined to stay the proceedings [FN5], but advised respondents that they would abide by any decision of the federal court if one was issued during the pendency of the arbitration proceedings. In addition, by letter dated January 11, 2002 Mr. Amron ***683** requested a stay of the arbitration in the declaratory judgment action pending in the United States District Court for the Eastern District of New York.

FN5. The request to stay was denied by letter dated January 7, 2002 from Florence M. Anderson, Case Manager for the American Arbitration Association. Exhibit I to the Appendix of Exhibits to Respondents' Supplemental Memorandum of Law in Opposition to Petition to Confirm Arbitration Award and in Support of Cross-Motion to Vacate Arbitration Award. The second request was denied on the record at the commencement of the arbitration hearings on June 24, 2001.

On June 26, 2002 Mr. Amron filed a Notice of Voluntary Dismissal Without Prejudice in the pending declaratory judgment action in the Eastern District of New York.

On September 10, 2002 the Award of Arbitrators was issued finding in favor of petitioners and against respondents. Specifically, the Award provides:

1. We find in favor of RESPONDENTS and against CLAIMANTS as a result of unclean hands in that CLAIMANT ALAN AMRON engaged in inequitable conduct in failing to disclose as required the existence of CLAIMANT AMRON DEVELOPMENT, INC. and all assets assigned to it.

2. We find in favor of RESPONDENTS and against CLAIMANTS on RESPONDENTS' counterclaim of common law fraud, in that CLAIMANT ALAN AMRON fraudulently concealed the creation of CLAIMANT AMRON DEVELOPMENT INC., a corporation with a confusingly similar name to ALAN AMRON DEVELOPMENT, INC.

3. We find in favor of RESPONDENTS and against CLAIMANT ALAN AMRON on the counterclaim of breach of contract, in that ALAN AMRON filed a certain declaratory judgment action in U.S. District Court, Eastern District of New York (No. 01-7830) in breach of paragraph 14(a) of the August 9, 1997 settlement agreement.

4. We find in favor of RESPONDENTS and against CLAIMANTS on the counterclaim of fraudulent conveyance with respect to a patent application for U.S. Patent No. 6,234,347.

5. Therefore, all claims by CLAIMANTS against RESPONDENTS for infringement of U.S. Patent No. 6,234,347 are DENIED.

6. CLAIMANTS, his or its successors and/or assigns are barred from enforcing U.S. Patent No. 6,234,347 against RESPONDENTS.

7. CLAIMANT ALAN AMRON shall pay to RESPONDENTS the sum of Forty Four Thousand Three Hundred Forty Three Dollars and Thirty-Seven cents. ($44,343.37) as RESPONDENTS' legal fees and costs in the declaratory judgment action filed by CLAIMANT ALAN AMRON in the U.S. District Court, Eastern District of New York (No. 01-7830). Such sum shall be paid within 30 days of the date of this AWARD.

8. Each party shall bear responsibility for his or its own attorney fees and costs.

The administrative fees and expenses of the American Arbitration Association totaling $8,300.00 and the compensation and expenses of the arbitrators totaling $15,938.00 shall be borne equally by the parties and have been paid.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

On September 13, 2002 petitioners filed the within petition to confirm the arbitration award. On September 30, 2002 respondents' motion to vacate the arbitration award was filed.

### *STANDARD OF REVIEW*

Review of an arbitration award is narrowly circumscribed by Section 10 of the ***684** Federal Arbitration Act ("Act").[FN6] Section 10(a) and (b) lists five circumstances under which the court may vacate an arbitration award:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN6. 9 U.S.C. § § 1-16.

(a)(1) where the award was procured by corruption, fraud or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10(a) and (b).

[1] In addition, "there exists a judicially created ground for vacating the arbitration award. The Supreme Court has stated that arbitration awards can be vacated if they are in 'manifest disregard of the law.' " *Mathers v. Sherwin Williams Company, Inc.,* No. Civ.A. 97-5138, 2000 WL 311030 at *6 (E.D.Pa. Mar.27, 2000)(Broderick, S.J.), (quoting *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 1927, 131 L.Ed.2d 985, 992 (1995)).

*DISCUSSION*

Petitioners contend that taking into account all the evidence before the arbitrators and the applicable standard of review, the arbitrators' ruling was correct and should be confirmed.

On the other hand, respondents contend that the arbitration award should be vacated because the arbitration panel: (1) exceeded its jurisdiction by usurping the authority of the federal courts to decide the issue of the arbitrability of petitioners' fraud based claims; (2) engaged in misconduct by refusing to postpone the arbitration hearing pending a ruling by the United States District Court for the Eastern District of New York on the Complaint for declaratory judgment; and (3) manifestly disregarded the law by, among other things, sanctioning respondents for asking the federal courts to decide the arbitrability of petitioners' claims (which respondents' contend is what the law requires), granting petitioners relief on petitioners' claim for fraudulent conveyance (which claim is allegedly time-barred), and declaring respondents' patent unenforceable against petitioners for all time (on grounds allegedly never recognized by any court).

We address these issues below.

*Authority to Arbitrate*

[2] Initially, respondents contend that the arbitration panel usurped that authority of the federal courts and engaged in misconduct within the meaning of 9 U.S.C. § 10 by deciding the scope of its own jurisdiction. Respondents assert that there is no clear and unmistakable evidence that respondents intended to delegate this power to the arbitrators.

Respondents rely on the decisions of the United States Supreme Court in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 1927, 131 L.Ed.2d 985, 992 (1995) and ***685** *AT & T Technologies, Inc. v. Communication Workers of America,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) for the proposition that in the absence of a clear intent by the parties to delegate the issue of arbitrability to the arbitration panel, it is for the federal courts to decide the issue of arbitrability.

In this case, respondents contend that the Settlement Agreement is not clear on this issue, so it is for the court to decide arbitrability. Thus, respondents contend that the decision of the arbitration panel should be vacated for this reason alone.

Petitioners contend that in the 1997 Settlement Agreement the parties expressly agreed that any claims against them by respondents and any issues involving water guns would be resolved in arbitration conducted by the American Arbitration Association ("AAA"). The underlying arbitration was commenced by respondent Alan Amron and Amron Development, Inc. claiming infringement of a patent for a "Pressurized Water Gun with Selective Pressurization" pursuant to paragraphs 14(a) and 19 of the Settlement Agreement.

Petitioners assert that they filed counterclaims which arose out of the allegation by them that at the time of the 1997 Settlement Agreement (which resolved the ten million dollar judgment against Alan Amron and allowed him to emerge from bankruptcy) Alan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Amron concealed from petitioners the existence of Amron Development Inc., and concealed an application for patent (the 717 patent) which matured into the patent-in-suit (the 347 patent).

Petitioners further contend that prior to commencement of arbitration, and with the consent of respondents, there was a reverse bifurcation of the issues at the arbitration. Specifically, the arbitration was to proceed first the counterclaims, after which the matter was to be heard on respondents' patent claim.

Petitioners aver that because the parties expressly agreed to the arbitration, and in the absence of a specific agreement to the contrary, the parties were deemed to incorporate the rules of the American Arbitration Association as they existed at the time of the arbitration. Rule 8 of these rules provides that arbitrators "shall have the power to rule on...jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." American Arbitration Association Rules and Procedures, Commercial Arbitration Rules, as amended, effective September 1, 2000, Rule 8.

Petitioners rely on the decision of the United States District Court for the Southern District of Florida in *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso v. MedPartners, Inc.*, 203 F.R.D. 677, 683-685 (S.D.Fla.2001)(Middlebrooks, J.) for the proposition that when the parties agree that the American Arbitration Association will arbitrate, but the agreement is silent on the issue of how that will be accomplished, then Rule 1 of the AAA's Commercial Arbitration Rules provides that the parties shall be deemed to have made the AAA's Rules a part of their arbitration agreement whenever the parties have provided for arbitration by the AAA. As noted above, Rule 8 of the AAA's Rules provide that arbitrators "shall have the power to rule on...jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

Moreover, petitioners contend that the parties agreed in paragraph 19 of the Settlement Agreement that disputes with respect to the interpretation of the contract would be submitted to arbitration. Petitioners assert that the issue of jurisdiction to arbitrate is an issue of contract interpretation,***686** and therefore an issue that the parties agreed to submit to the arbitrators.

Finally, relying on the decision of the United States Court of Appeals in *GK MGT Inc. v. Local 274*, 930 F.2d 301, 304 (3d Cir.1991) petitioners contend that the arbitrators' exercise of jurisdiction must be given the same deference as their rulings on the merits, and may only be overturned for manifest disregard for the law. Petitioners assert that the arbitrators correctly determined jurisdiction because the resolution of the dispute on the issues raised in their counterclaims were an integral part of the "dispute" which respondents brought to arbitration of alleged patent infringement. Petitioners further contend that the counterclaims were arbitrable because they were part of the dispute over the enforceability of the patent.

For the following reasons, we conclude that the arbitration panel did not err in determining the scope of its jurisdiction in the arbitration.

We agree generally with respondents that in the absence of a clear intent by the parties to delegate the issue of arbitrability to the arbitration panel, it is for the federal courts to decide the issue of arbitrability. *First Options, supra.* Furthermore, we agree that the AAA Rules could not be an express part of the agreement of the parties, especially Rule 8 which provides that the arbitrators have the power to rule on jurisdiction, because those rules were not in effect at the time the Settlement Agreement was executed. Therefore, those rules could not be known by the parties to be part of the Settlement Agreement. However, we conclude that the arbitrators did not commit a manifest disregard for the law in this matter.

A review of the declaratory judgment Complaint filed by Mr. Amron in the United States District Court for the Eastern District of New York reveals that what Mr. Amron sought was not a determination of the arbitrability of respondents' counterclaims. Rather, what he sought was a declaratory judgment declaring that (1) defendants are precluded from asserting any claims against petitioners for things that did or did not occur before execution of the Settlement Agreement in 1997; (2) any allegations of fraud by respondents are without merit; and (3) because petitioners had not raised certain claims of fraud when the issues first became known to them during the 1999 arbitration, respondents should now be estopped from raising those claims.

We conclude that Mr. Amron did not seek a determination from a federal court whether certain issues were arbitrable or not. Rather, what Mr. Amron sought was a judicial determination, on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

merits, that he committed no fraudulent acts. Moreover, Mr. Amron withdrew his federal action after the panel commenced the arbitration, but before a determination by the court on his declaratory judgment action. This withdrawal constituted a waiver of the matter because, even though the arbitrators began the arbitration proceedings, there was sufficient time between commencement of the arbitration in June 2002 and the arbitration award in September 2002 for the federal court to rule on Mr. Amron's action. If the federal court had ruled in Mr. Amron's favor, the arbitrators would have been bound by that decision.

Furthermore, upon de novo consideration of the issue of arbitrability, we conclude that the arbitrators correctly determined that jurisdiction was properly before the panel. This is because the resolution of the dispute on the issues raised in the counterclaims was an integral part of the "dispute" of alleged patent infringement which respondents brought to arbitration. Moreover, the ***687** counterclaims were arbitrable because they were part of the dispute over the enforceability of the patent.

Accordingly, because we conclude that respondents never sought a judicial determination regarding the arbitrability of any issue, because we determine that respondents waived any contest on this issue by voluntarily withdrawing their federal action and because we find that petitioners' counterclaims were arbitrable, we conclude that the arbitrators did not commit a manifest disregard of the law on this issue.

*Denial of Request for Stay of Proceedings*

[3] Respondents assert that the arbitrators engaged in misconduct by failing to postpone the arbitration hearing upon sufficient cause shown while the District Court in the Eastern District of New York decided the issue of arbitrability.

Courts may vacate an arbitration award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown...." 9 U.S.C. § 10(a)(3). The United States Court of Appeals for the Third Circuit has defined "misconduct" under 9 U.S.C. § 10(a)(3) as conduct "which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Newark Sterotypers' Union v. Newark Morning Ledger Company*, 397 F.2d 594, 599 (3d Cir.1968).

In this case, respondents have not attempted to articulate how their rights were so affected as to deprive them of a fair hearing. Rather, respondents simply state that it was error to deny the request to stay the arbitration until the federal court in New York ruled on the declaratory judgment action. We disagree.

As noted above, Mr. Amron's declaratory judgment action did not actually seek a determination of whether any issues were arbitrable. Rather, he sought declarations that he had done nothing wrong. Moreover, because after de novo review we have concluded that the arbitrators correctly determined the scope of their jurisdiction to hear petitioners' counterclaims, we conclude that respondents were not in any way deprived of a fair hearing.

Accordingly, we conclude that the arbitrators were not guilty of misconduct in denying respondents' request to stay the arbitration.

*Fraudulent Conveyance*

Respondents contend that the arbitrators erred in granting relief on the petitioners' counterclaim for fraudulent conveyance because the matter was time-barred. Respondents assert that New York C.P.L.R. § 202 (New York's borrowing statute) provides that New York defendants (for purposes of petitioners' counterclaims), such as Alan Amron and Amron Development, Inc., are entitled to the benefit of the shorter of the New York statute of limitations or the statute of limitations in the state where petitioner resides.

In this case, petitioner Larami Limited, the party whom respondents claim is infringing on its patent, resides in the State of Delaware which has a one-year statute of limitations on a cause of action for fraudulent conveyance. Respondents contend that petitioners knew as early as May 18, 1999 about the patent application on the 771 patent but did not raise the counterclaims until December 19, 2001.

Thus, respondents contend that because petitioners knew about the alleged fraudulent conveyances for more than one year before raising the issue as a counterclaim in the arbitration proceeding, the arbitrators should have found the fraud-based counterclaims to be time-barred by the statute of limitations.

***688** Petitioners aver that their counterclaims are not time-barred because under New York C.P.L.R §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

203(d) a counterclaim is not time-barred, regardless of the statute of limitations, if it arose from the transactions, occurrences or a series of transactions or occurrences upon which the claim asserted depends. Thus, petitioners argue that because Mr. Amron fraudulently concealed the existence of the second corporation and concealed the existence of the patent application on the 771 patent transferred to this entity, respondents waived the right to assert that counterclaims based upon the fraudulent concealment are time-barred.

For the following reasons we agree with respondents, disagree with petitioners and conclude that the arbitrators exercised a manifest disregard for the law in finding for petitioners on their counterclaim for fraudulent conveyances.

The parties do not dispute the residence of either petitioner Larami Limited or respondents. Moreover, the parties do not dispute the application of New York law. Accordingly, we apply New York law to this matter.

[4] In applying New York law, the first step is to determine the effect of New York's "borrowing statute". Section 202 of the New York Civil Practice Law and Rules provides:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y.C.P.L.R. § 202.

Courts have generally interpreted the place of injury in fraud actions as the residence of the injured party. *Bache Halsey Stuart Inc. v. Namm,* 446 F.Supp. 692, 697 (S.D.N.Y.1978). Because Larami Limited is a Delaware corporation, we must apply Delaware law under the New York borrowing statute if it is shorter than the New York period. Furthermore, pursuant to the New York borrowing statute, we must apply the entire body of limitations law of the foreign jurisdiction where a cause of action accrues in favor of a New York non-resident. *Namm, supra.*

[5][6] Under Delaware law, a cause of action with respect to a fraudulent transfer or conveyance is extinguished unless an action is brought within four years after the transfer is made or, if later, within one year after the transfer is or could reasonably have been discovered. Furthermore, concealment of a fraudulent conveyance, not reasonably discoverable, tolls operation of the statute. *See In re: Kelly,* 289 B.R. 38 (Bankr.D.Del.2003); 6 Del. C. § 1309. In addition, a counterclaim is an action for statute of limitations purposes. *B. Lewis Productions, Inc. v. Bean,* No. Civ.A. 02-93, 2005 WL 273298, *2, 2005 U.S. Dist. LEXIS 1549 at *6. (D.Del.2005)(Jordan, J.).

Section 203(6)(d) of the New York Civil Practice Law and Rules provides:

(d) Defense or counterclaim. A defense or counterclaim is interposed when a pleading containing it is served. A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose upon transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it ***689** was barred at the time the claims asserted in the complaint were interposed.

N.Y.C.P.L.R. § 203(6)(d).

In applying statutes of limitations to this matter, it is clear that Delaware has a four-year statute of limitations with a one year discovery rule and that a counterclaim is subject to the statute of limitations. New York has no statute of limitations for a counterclaim when the counterclaim arises from the same transaction, occurrence or series of transactions or occurrences.

By relying on § 203(6)(d) respondents essentially concede that their counterclaim for fraudulent conveyance arises from the transactions, occurrences of series of them upon which respondents' claim for patent infringement depends. Thus, because New York has no statute of limitations on counterclaims of this type and because Delaware has a defined statute of limitations, we conclude that we must apply Delaware law to this matter.

In applying Delaware law to the facts of this matter, it reveals that petitioners would have either four years from the fraudulent conveyance of the 771 patent application from Alan Amron Development, Inc. to Amron Development, Inc, which transfer occurred in July 10, 1995. Thus, petitioners would have until July 10, 1999 to file any counterclaim for fraudulent conveyance. However, petitioners contend that they did not discover the fraudulent conveyance until May

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

18, 1999. Hence, applying the one-year discovery rule, petitioners would have until May 18, 2000 to file their counterclaim.

In this case, petitioners' counterclaim with the AAA is dated December 19, 2001, some 19 months after the expiration of the statute of limitations.

[7] A manifest disregard for the law contemplates more than an error of fact or law. Rather, it is reserved for situations where an arbitrator recognizes a clearly governing legal principle and then proceeds to ignore it. *Smith v. PSI Services II, Inc.*, No. Civ.A. 97-6749, 2001 WL 41122 (E.D.Pa. Jan.12, 2001) (Waldman, J.).

[8] The parties do not dispute that the issue of the statute of limitations on petitioners' counterclaim was fully presented to the arbitrators. We conclude that failure to properly apply the statute of limitations in this matter rises beyond a simple error of law to a manifest disregard of the law because if petitioners' counterclaim were barred by the statute of limitations, it had no cause of action. For the arbitrators to rule in favor of petitioners on a cause of action that was barred rises to the level necessary to vacate that decision notwithstanding the extreme deference we must give to the arbitrators' decision.

Accordingly, because we find a manifest disregard of the law as it relates to the counterclaim for fraudulent conveyance, we vacate that portion of the decision which finds in favor of petitioners and against respondents on the counterclaim for fraudulent conveyance.

*Breach of Contract*

[9] Respondents allege that the arbitrators erred when they held that it was a breach of the Settlement Agreement for Mr. Amron to seek declaratory relief from the federal courts. Specifically, respondents contend that Mr. Amron had every right to seek a decision from the federal courts on the arbitrability of certain issues in this case which are not related to water guns.

More specifically, respondents aver that the declaratory judgment action did not bring a "claim" in a monetary sense. Rather, what Mr. Amron sought was a ***690** determination of where the authority to determine certain issues was vested (i.e. with the arbitrators or with the federal courts). For the following reasons we disagree with respondents and confirm this part of the arbitration award.

Paragraph 14 (a) of the Settlement Agreement between the parties provides:

For a period of ten years, Amron and any companies controlled by him or for which he serves as an officer will not commence any litigation against Myung Song, Alvin Davis, Star Creations, Larami Limited or Hasbro, but will agree to bring any claim against any of the foregoing to binding arbitration before the American Arbitration Association in Philadelphia. Amron further agrees that during this period he will not publicize any dispute with or claim against any of the foregoing. Notwithstanding the foregoing, disputes involving Hasbro, its affiliates, subsidiaries or related companies (except Larami, Ltd.) Shall be referred to arbitration if the same involves water guns.

In this case, the arbitrators concluded that Mr. Amron breached this provision of the Settlement Agreement by filing his declaratory judgment action in United States District Court for the Eastern District of New York.

As noted above, we conclude that Mr. Amron's declaratory judgment action sought a determination on the merits that he had not committed fraud and that petitioners should be collaterally estopped from raising certain issues in the future. The language of the Settlement Agreement is very clear that Mr. Amron and "any companies controlled by him...will not commence any litigation against Myung Song, Alvin Davis, Star Creations, Larami Limited or Hasbro, but will agree to bring any claim against any of the foregoing to binding arbitration before the American Arbitration Association in Philadelphia."

The declaratory judgment action named all of those entities, among others, as defendants. Thus, it is clear that by filing the declaratory judgment action in federal court in New York, respondents commenced litigation against petitioners in a forum other than the AAA in Philadelphia, Pennsylvania.

Accordingly, applying the standard of review in this matter, we conclude that it was not a manifest disregard of the law for the arbitrators to conclude that respondents breached this provision of the contract. Hence, we confirm this portion of the arbitration award.

*Unclean Hands*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Respondents contend that the arbitrators manifestly disregarded the law by rendering the patent at issue unenforceable against petitioners because of respondents' unclean hands (by finding that the existence of the patent application and the additional corporate entity was concealed in a different litigation). Respondents aver that no court has ever granted such extraordinary relief absent misconduct before the patent office or in the specific litigation.

Petitioners contend that unclean hands is a recognized equitable defense to an action for patent infringement. Petitioners rely on the decision in *Ott v. Goodpasture, Inc.*, 40 U.S.P.Q.2d 1831 (N.D.Tex.1996) for the principle that the doctrine of unclean hands may be applied to prevent a patentee who has concealed the existence of a patent in bankruptcy proceedings from later enforcing it in an infringement proceeding. For the following reasons, we conclude that the arbitrators did not commit a manifest disregard of the law in applying the doctrine of unclean hands to ***691** respondents' claim for patent infringement or declaring the patent at issue to be unenforcable against petitioners.

[10][11] Unclean hands is a recognized equitable defense to an action for patent infringement. *Mylan Pharmaceuticals v. Thompson*, 268 F.3d 1323, 1331 (Fed.Cir.2001). To prove the defense of unclean hands, petitioners must show that respondents conducted themselves in such a manner so as to shock the moral sensibilities of the trier of fact. *See Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959). Stated differently, respondents' conduct must be "offensive to the dictates of natural justice." *Aptix Corporation v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1375 (Fed.Cir.2001).

"One who comes in equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court." *Gaudiosi*, 269 F.2d at 881.
A fundamental principal upon which equity jurisprudence is found is that before a complainant has standing in court, he must not only show a good and meritorious cause of action, but also must come into court with clean hands.... Everything that enables a full and fair determination of the matters in controversy should be placed before the court. The governing principle is that if a party, who sets the judicial machinery in motion to obtain a remedy, violates conscience, good faith or any other equitable principal 'then the doors of the court will be shut' and the court will refuse to acknowledge his right to any remedy. The clean hands maxim gives broad discretion to the court's equity power in refusing to aid an unclean hands litigant. It is not related to the liabilities or claims of the parties, nor fettered by the absence of actual damages. The court is not bound by any formula, restraint or limitation which restricts the free and just exercise of its equitable discretion. Any willful act, which can be rightfully said to transgress equitable standards, is sufficient.... The unclean hands doctrine provides a defense to an otherwise valid legal claim when a plaintiff has engaged in 'unconscionable' conduct that 'has an immediate and necessary relation to the equity that [the claimant] seeks in respect of the matter in litigation.'

*Honeywell International, Inc. v. Universal Avionics Systems Corp.*, 343 F.Supp.2d 272, 321 (D.Del.2004) (Citations omitted.)

[12] Based upon the record before the court, we conclude that the arbitrators did not commit a manifest disregard of the law in determining that respondents came to the arbitration with unclean hands by failing to disclose the existence of the patent application for the 771 patent and the existence of Amron Development, Inc. during the pendency of the bankruptcy proceedings and the settlement negotiations.

[13] Respondents further contend that their 347 patent is a presumptively valid grant of personal property and is therefore enforceable even in light of any alleged concealment of the patent application and a corporate entity in an earlier, unrelated proceeding. Respondents rely on the decision of the United States Court of Appeals for the Federal Circuit in *Aptix, supra,* for the proposition that the arbitrators exceeded any known authority by declaring the 347 patent unenforceable against petitioners. We disagree.

In *Aptix* the Court of Appeals for the Federal Circuit overturned that portion of the District Court's decision rendering the patent in that matter unenforceable. However, a review of the underlying District***692** Court decision [FN7] reveals that the error by the District Court was the total invalidation of the patent against the entire world rather than simply against the parties involved in the case.

FN7. *Aptix Corporation v. Quickturn Design Systems, Inc.*, 269 F.3d 1369 (N.D.Cal.2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In this case, the arbitrators found the 347 patent unenforceable only against petitioners. The arbitrators did not rule that the 347 patent was unenforceable against the entire world. Thus, respondents intellectual property right in the 347 patent is still enforceable against any person or entity except petitioners. We conclude that this factual distinction takes this matter outside the holding of the Federal Circuit in *Aptix.*

Moreover, we note that the Settlement Agreement between the parties involved respondents giving up the right to seek enforcement of certain patents and trademarks involving water guns in exchange for a drastic reduction in the rights petitioners held in the $10,000,000 judgment against Mr. Amron.

We further conclude that if the patent application for the 771 patent had been disclosed it would have been included in the Settlement Agreement. The 771 patent is the parent of the 347 patent. Thus, it would also have been included in the Settlement agreement if disclosed.

Because we conclude that the decision of the arbitrators to bar enforceability of the 347 patent by respondents against petitioners is consistent with the terms and spirit of the underlying Settlement Agreement, we conclude the arbitrators' decision does not constitute a manifest disregard of the law.

Accordingly, we grant the petition to confirm the arbitrators' award and deny the motion to vacate it on this issue.

*CONCLUSION*

For all the foregoing reasons, we confirm in part and vacate in part the arbitration award in this matter. Specifically, we vacate that portion of the award which finds in favor of petitioners and against respondents on petitioners' counterclaim for fraudulent conveyance. In all other respects we confirm the award and enter judgment in favor of petitioners consistent with the award.

E.D.Pa.,2006.
Hasbro, Inc. v. Amron
419 F.Supp.2d 678

Briefs and Other Related Documents (Back to top)

• 2:02mc00231 (Docket) (Sep. 13, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.